Eva CIECHON, Plaintiff-Appellee,

v.

The CITY OF CHICAGO, et al., Defendants-Appellants.

No. 80–2397.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 27, 1981.

Decided Aug. 10, 1982.

Rehearing and Rehearing En Banc Denied Oct. 4, 1982.

Maureen J. Kelly, Chicago, Ill., for defendants-appellants.

Linda R. Hirshman, Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, SPRECHER,* Circuit Judge, and GRANT,** Senior District Judge.

---

* This opinion was assigned to Judge Sprecher who voted to affirm at the post-argument conference. However, he died before completing a proposed opinion.

CUMMINGS, Chief Judge.

This appeal raises the issues of whether the City of Chicago violated the Fourteenth Amendment's guarantees of equal protection and due process by discharging Eva Ciechon from her position as a career paramedic with the Chicago Fire Department. The district court granted summary judgment on Ciechon's constitutional claims and ordered her reinstatement. We affirm.

## I

The following synopsis is based on the record and the district court's findings:

Plaintiff Eva Ciechon has been a permanent career service paramedic with the Chicago Fire Department since 1976. When this litigation was commenced, Ciechon had worked for the Fire Department for approximately three years. During that time she had maintained an unblemished personnel record and had received several letters of appreciation from people she had assisted.

The events which were the basis for the Fire Department's dismissal of Ciechon occurred on January 16, 1979. Chicago was still trying to cope with record-setting snow conditions as the result of a blizzard. Two days earlier, on January 14, 1979, Fire Commissioner Richard Albrecht had issued an order to all paramedics to report for duty before their scheduled shifts in order to provide additional personnel to assist in delivering emergency care during the severe snow conditions.

Ciechon responded to Commissioner Albrecht's order and reported to her assigned firehouse at 5:30 p. m. on January 14, fourteen hours before her scheduled shift. Ciechon worked for those fourteen hours plus her regular shift, a total of thirty-eight hours, on Ambulance # 44. For the first fourteen hours, Ciechon worked with paramedics Liz Wills and Richard Ritt; Ciechon and Ritt worked the remainder of the

** The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

time. The paramedics worked as a team rather than according to defined individual responsibilities. On each run the paramedics divided the work of interviewing and assessing patients, administering treatment, and filling out necessary forms. The division of work was made without explicit instructions from one paramedic to another and varied on the runs.

At 10:30 ·p. m. on January 16, having made twenty-six runs in twenty-seven hours, Ambulance # 44 was dispatched on an inhalator call to the John Ciebien apartment at 1827 W. Evergreen Avenue. The personnel on the ambulance on that run were paramedics Ciechon and Ritt, ambulance driver Ed Altman, and candidate firefighter James Dziedzic. Dziedzic had been assigned to the ambulance to provide extra manpower because of the snow conditions. Altman was forced to park the ambulance about a block away from the Evergreen address because of the snow. Ciechon got out of the ambulance and asked Ritt and Dziedzic to bring oxygen, which they did.

The two paramedics and the other two members of the ambulance team were led to the second-floor apartment of the Ciebiens by Mary Ciebien. Mary's mother had called the paramedics because her 66-year-old husband, John Ciebien, was having difficulty breathing. When the paramedics entered the apartment, Mr. Ciebien was seated at the dining-room table. Ciechon asked him what was wrong, and he replied that he had been out shoveling snow and chopping ice and now was having difficulty breathing. Ciechon checked his pulse and respiration. He had no pain and seemed

alert. He also said he had experienced this problem before. Paramedic Ritt listened to Mr. Ciebien's lungs and inquired about medication he was taking while Ciechon talked to the family.

The family volunteered the information that Mr. Ciebien had suffered a collapsed lung a year before which had required hospitalization. The family did not know what had caused the collapsed lung. Mr. Ciebien requested oxygen, but Ciechon refused to give oxygen because, based on her medical training, she felt it was inadvisable to give oxygen to a patient with a history of a collapsed lung of unknown origin. As she put it, it might do more harm than good. Several times she and Dziedzic urged Mr. Ciebien to go to "the hospital" and plaintiff instructed Altman to try to move the ambulance closer to the apartment so that Ciebien could be transported. However, he refused to be transported to the hospital. Ciechon feared that if oxygen were administered and complications occurred, the snow conditions would make it difficult to return quickly to the apartment. She explained to the family that she could not force him to go, and explained several times to the family why oxygen could not safely be administered. The ambulance crew finally left the apartment, telling the family to keep Mr. Ciebien sitting up and to call again if there was any change in his condition.

After the paramedics left, Mr. Ciebien's condition suddenly worsened. Mrs. Ciebien called the emergency number 911 and requested that the paramedics return.[1] When

1. The text of that conversation is as follows:

CALLER: [Mrs. Ciebien]: I called the ambulance before, they came here and looked at my husband but they would not give him oxygen because they said he had hard breathing, but he is getting worse now. I think they should come back; they said they would come back.

ALARM OFFICE: Where is this at?

CALLER: 1827 West Evergreen.

ALARM OFFICE: Hold on madam.

FIREHOUSE: Engine F57.

ALARM OFFICE: Can I speak to one of the ambulance guys? This is the office.

ALARM OFFICE: Just a minute madam we're trying to get you an ambulance.

CALLER: Will you hurry?

ALARM OFFICE: What do you guys have at 1827 West Evergreen?

EVA CIECHON: 1827 West Evergreen?

ALARM OFFICE: I think it was your last run.

EVA CIECHON: An old guy had shortness of breath. He was shoveling snow.

ALARM OFFICE: Did you do anything? I got him on the phone again.

EVA CIECHON: He didn't want to go to the hospital.

the ambulance arrived, Ciechon directed Dziedzic and Altman to bring the stretcher to the apartment. When they entered the apartment Mr. Ciebien already seemed dead. Nevertheless the paramedics and the other two comprising the ambulance crew transported him to St. Elizabeth's Hospital where he was officially pronounced dead.

Within a few days of Mr. Ciebien's death, his family contacted the Chicago Mayor's Office of Professional Standards and the local CBS television network affiliate to complain about the service the paramedics had provided. Captain John Ormond, Supervisor of the Chicago Fire Department's Bureau of Emergency Medical Services, investigated the complaint. The Ciebien family claimed without support that on the first run the paramedics had done nothing: no medical equipment was brought to the apartment; no oxygen was administered, despite the repeated requests of the family; no vital signs were checked, and the paramedics refused to take Mr. Ciebien to the hospital. Ormond interviewed Ciechon and Altman about the two runs, and they both stated that Mr. Ciebien's condition had been assessed, that he had refused to be transported to the hospital, and that the oxygen they brought had not been administered because of the perceived danger of such treatment in light of Ciebien's history of a collapsed lung. Ormond also interviewed

Ritt informally at another firehouse, and Ritt confirmed Ciechon's and Altman's versions of the incident. Altman, Ciechon and Ritt all submitted written reports on the incident which were consistent with what they had told Ormond.

A second set of interviews was then conducted by Captain Ormond together with Dr. Paul Mesnick, Medical Director for the Bureau of Emergency Medical Services. They interviewed the Ciebien family, Ciechon, and Altman, but not Ritt. Again the family and the ambulance crew differed in their accounts of what had occurred on the ambulance run.

On February 13, 1979, Ciechon was suspended for thirty days because of the Ciebien run and was charged with (1) failure to bring proper equipment to the scene of an emergency; (2) failure to perform patient assessment; and (3) failure to complete medical information report forms. After thirty days Ciechon was suspended indefinitely. The following further charges were added on March 5, March 29, April 16, and April 24, 1979: (1) failure to offer transport to the closest hospital; (2) failure to perform investigatory steps, including a physical examination, necessary to assess the patient's condition; (3) failure to communicate with the supervisory hospital; and (4) failure to provide treatment. On April 30,

ALARM OFFICE: Did you say you'd come back?

EVA CIECHON: No. I told him if he goes back out and shovels snow I says God forbid he would have a heart attack and I says it could be an hour before he can get an ambulance.

ALARM OFFICE: Because she may be saying he's got a shortage of breath then you gotta go back—just a minute—

EVA CIECHON: He's only got one lung and he's been out shoveling snow and chipping ice.

ALARM OFFICE: *Hello madam. The ambulance says he didn't want to go to the hospital. If he doesn't want to go to the hospital we can't take him.*

CALLER: *I wish he would go to the hospital. He is just breathing. He says he wants to go now.*

ALARM OFFICE: *Madam this is no taxi cab service. Either he is going or he is not going to go. Which is it going to be?*

CALLER: *Now he is going.*

ALARM OFFICE: Well he'd better go this time. If he is going, you have someone out waiting for the ambulance?

CALLER: Yes.

ALARM OFFICE: Is that the 1st Floor?

CALLER: Yes.

ALARM OFFICE: You get back to 1827 West Evergreen.

EVA CIECHON: You know what he wanted, he wanted us to give him oxygen and then leave. He did not want to go with us.

ALARM OFFICE: If he doesn't go with you this time tell him you are not coming back. Ad. Hearing, Stip. Exh. 1 (emphasis added). This transcript was stipulated to by both parties at the administrative hearing as an accurate transcript of the Fire Department's tape of the conversation. Mrs. Ciebien testified at the administrative hearing, however, that this was not how she remembered the conversation.

1979, shortly before the hearing on these charges, the chairman of the Personnel Board notified Ciechon that the Board would seek her discharge.[2] No charges were filed against any other member of the ambulance crew.

On May 2, 1979, Ciechon brought this action under Section 1 of the 1871 Civil Rights Act (42 U.S.C. § 1983) in the Northern District of Illinois, alleging violations of due process and equal protection arising from her suspension. The defendants were the City of Chicago, the Commissioner of its Fire Department and the four members of the City's Personnel Board. A temporary restraining order was granted reinstating Ciechon to the city payroll pending an administrative hearing and decision on the charges against her by the Chicago Personnel Board.

Hearings on the charges were held in May and June of 1979. The hearing officer dismissed the charges of failure to offer transport and failure to complete medical forms, but found the evidence sufficient to support the remaining charges. He concluded that both suspensions of Ciechon were proper and recommended discharge from her position as a career paramedic. The Personnel Board adopted the hearing officer's recommendations on November 30, 1979.

On February 5, 1980, the City filed a motion in the district court for leave to discharge Ciechon in accordance with the Personnel Board's decision. Ciechon filed an amended complaint on February 15, 1980, alleging that her discharge violated equal protection of the laws because she had been singled out for discipline while no action had been taken against her co-paramedic, Ritt. She also claimed that the investigatory procedures, the charging process, and the administrative hearing violated her constitutional right to due process of law. The parties filed cross-motions for summary judgment and submitted a tran-

script and all exhibits of the administrative hearing as the basis for the respective motions. On May 4, 1980, the district court held in favor of Ciechon and ordered her reinstatement with back pay. A decision awarding her attorneys' fees and costs was issued August 8, 1980, and final judgment on all prior orders in her favor was entered August 28, 1980. The City has appealed from that judgment.

II

It seems unbelievable that a three-year career paramedic with a theretofore unblemished record would be discharged for a single incident of alleged improper conduct. The situation becomes even more incredible when the single alleged incident occurred during the record-setting Chicago blizzard of 1979, after the career paramedic had been called to duty fourteen hours prior to her scheduled shift and had been involved in twenty-six emergency ambulance runs in the course of twenty-seven straight hours immediately preceding the incident.

The after-the-fact perception that the single incident was life-threatening and the fact that the patient died within an hour thereafter clothed the event with a depressing morbidity, which understandably traumatized the patient's family and clearly called for an investigation. The mere fact that the patient expired shortly after being attended, however, is no more a *per se* indication of the paramedic's fault than it is considered the doctor's fault when a patient dies leaving the doctor's office after receiving a positive physical examination.

In this case the family's grief was expressed in pointless vengeance and, in view of media and family pressure, the official investigation was single-mindedly and intentionally directed to ruining the career of one, but only one, of the four employees involved in this unfortunate incident. Because of these two factors, we have no difficulty in finding violations of procedural

2. Captain Ormond testified at the administrative hearing that he had concluded that there was nothing to warrant Ciechon's discharge based on his investigation of the Ciebien complaint. Fire Commissioner Albrecht testified that he had not recommended any particular discipline against Ciechon when he filed charges with the Personnel Board.

due process and equal protection. However, we have no intention of opening the floodgates to review all municipal personnel decisions. It is only because these defendants purposely and invidiously chose one of two similarly situated employees for undeserved punishment and misused otherwise legitimate disciplinary procedures that our intervention is justified. See *Shango v. Jurich*, 681 F.2d 1091, 1103–1104 (7th Cir. 1982), and cases there cited.

### A. *Due Process Violation*

■ Due process of law fundamentally requires a fair proceeding. *Boddie v. Connecticut*, 401 U.S. 371, 375, 91 S.Ct. 780, 784, 28 L.Ed.2d 113; *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942; *Wong Yang Sung v. McGrath*, 339 U.S. 33, 49–50, 70 S.Ct. 445, 453–454, 94 L.Ed. 616. Fairness is insured by procedural safeguards which require proper notice and an opportunity to be heard. See, *e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 267–68, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287. Fairness also dictates that the procedure itself not be abused or misused. No matter how complete the panoply of procedural devices which protect a particular liberty or property interest,[3] due process also requires that those procedures be neutrally applied. *Wong Yang Sung v. McGrath*, 339 U.S. 33, 50, 70 S.Ct. 445, 454, 94 L.Ed. 616; see *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942; *Hurtado v. California*, 110 U.S. 516, 536–37, 4 S.Ct. 111, 121, 28 L.Ed.2d 232. Even if the procedures themselves are legitimate, it is impermissible to employ those procedures vindictively or maliciously so as to deny a particular individual due process. See *Blackledge v. Perry*, 417 U.S. 21, 25–28, 94 S.Ct. 2098, 2101–2102, 40 L.Ed.2d 628; *North Carolina v. Pearce*, 395 U.S. 711, 723–26, 89 S.Ct. 2072, 2079–81, 23 L.Ed.2d 656. The record in this case demonstrates that the City misused its otherwise legitimate disciplinary procedures in a single-minded effort to discharge Ciechon for her role in this unhappy sequence of events, and it thereby violated her right to due process of law.

Due process also was violated by the City's unfortunate reaction to the Ciebien family's threat of adverse publicity, which infused the disciplinary procedures with a deliberate, illegitimate bias. Due process requires that a hearing " 'must be a real one, not a sham or a pretense.' " *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 164, 71 S.Ct. 624, 644, 95 L.Ed. 817 (Frankfurter, J., concurring) (quoting *Palko v. Connecticut*, 302 U.S. 319, 327, 58 S.Ct. 149, 152, 82 L.Ed. 288)). The record here, however, reflects the City's panic under pressure from the media and a vengeance-seeking family, leading to the decision to discharge one paramedic to defuse the situation. A similar case was recently decided by the Third Circuit sitting *en banc*, where the court held that state prison officials violated an inmate's due process rights when they denied his application for a work-release program because of fear of adverse public reaction. *Winsett v. McGinnes*, 617 F.2d 996 (3d Cir. 1980), certiorari denied, 449 U.S. 1093, 101 S.Ct. 891, 66 L.Ed.2d 822. This "consideration of impermissible criteria" distorted the normal process of evaluating work-release applications, resulting in a deprivation of procedural due process. *Id.* at 1007–08.[4]

---

**3.** Ciechon had a property interest in her job based on the statutory requirement that permanent career service employees of the City not be discharged without cause. Chicago Ill., Code ch. 25.1–6; Chicago Personnel Rules & Regulations, Rule XVI §§ 3, 4; *Ciechon v. City of Chicago*, 634 F.2d 1055, 1058 (7th Cir. 1980), see also *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548; *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570; *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15, as explained in *Bishop v. Wood*, 426 U.S. 341, 345 n. 8, 96 S.Ct. 2074, 2078 n. 8, 48 L.Ed.2d 684.

**4.** As the *Winsett* court noted in a footnote, bowing to public pressure can have more than one result:

> If work release for a prisoner is not determined solely on the basis of the statutory and regulatory criteria established by the state but may also depend upon what may be perceived public reaction to it, these extraneous considerations can cut both ways. Not only can worthy work release applications be

Cf. *Sheppard v. Maxwell*, 384 U.S. 333, 351, 354–55, 86 S.Ct. 1507, 1516, 1517–18, 16 L.Ed.2d 600 (due process violated by massive prejudicial publicity before and during trial); *Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (due process requires impartial jury unbiased by pretrial publicity). Similarly, impermissible considerations were injected into the Personnel Board proceedings here which deprived Ciechon of due process.

A review of the record clearly demonstrates the City's consideration of possible adverse publicity and the prejudicial misuse of personnel procedures which permeated the discharge proceedings. The Ciebien family complained to the Mayor's Office of Professional Standards and wrote a six-page letter to the Chicago CBS television affiliate a few days after the patient died. When asked why she wrote the letter of complaint to CBS, the patient's daughter responded:

> It was as a backup in the case, [if] nothing transpired with our complaint, then, we'd follow it through that way.

Tr. 5/22/79, 311. The complaint to the City and the CBS television station triggered the initial investigation by Captain Ormond. Ormond testified that when he interviewed the Ciebien family during his investigation, the family was very upset and wanted something done. The family testified that indeed Ormond promised that something would be done: he told Mrs. Ciebien that Ciechon had been suspended and would be dismissed after the upcoming hearing. The family attended the disciplinary hearing, where several of them testified on behalf of the City.

There were five events that occurred during the course of the paramedics' visit to the Ciebien apartment which, when coupled with the unfortunate death of the patient, caused great anger to the members of the

patient's family. The investigation of those events to determine the legitimacy of the family's complaint was, based on the record at the hearing, single-minded in its focus on Ciechon and remarkably shallow—the investigators failed even to look at available documentary evidence of what transpired on the paramedics' runs to the Ciebien apartment. The record simply does not support the City's position that the events complained of by the family rationally support the decision to seek Ciechon's discharge.

1. The family was very upset by a comment made to Mrs. Ciebien when she called for the ambulance the second time. When she asked for the ambulance to return, the dispatcher told her that "this is no taxi cab service." [5] Ciechon had no responsibility whatever for this remark; if it was to be the subject of any discipline, that discipline could only logically have been directed at the dispatcher. There was no evidence that the investigators ever directed any attention to resolving this complaint.

2. The family was under the impression that all four members of the ambulance team were paramedics, and yet "nothing" was done. In fact, however, Altman was a driver-attendant and Dziedzic was a candidate firefighter who was brought along in the wake of the blizzard to help carry equipment and to carry patients on stretchers. While paramedics Ciechon and Ritt ministered to Mr. Ciebien, then a coherent, rational patient, Altman and Dziedzic had nothing in particular to do. Consequently, they stood around, looking out the window at weather conditions, and watching the television which the family was watching. This greatly disturbed the family. However, since there was no apparent emergency which required their assistance, the family's objection to their ease was unwarranted. [6]

---

thereby denied but similar influences may compel admittance to the program of undesirable and unqualified applicants.
617 F.2d at 1008, n.14.

5. See note 1, *supra*.

6. The evidence shows that the patient's family, who of course knew the patient most intimately, was not unduly alarmed at his condition. The patient's widow testified that ordinarily when her husband needed medical attention, she called a doctor or a hospital rather than paramedics. The tape recording of the first

3. Paradoxically, the family resented the only woman on the team because they believed she was performing too many services, rather than because she was giving too little attention to the patient. During his investigation, Captain Ormond found that Ciechon was derogatorily and continuously referred to as "the girl" by the family members. When they appeared as witnesses at the administrative hearing, the family members referred to Ciechon as "the female." As noted, the record demonstrates that the family was mistakenly of the impression that all four persons on the team were paramedics and that they resented the fact that the only woman involved performed the medical functions while two of the men, not paramedics (event 2 *supra*), were standing around doing nothing.

4. The family was most upset by the failure of the paramedics to give the patient oxygen, and, in fact, contended that oxygen was not brought from the ambulance. Ciechon testified, however, that she ordered Ritt and Dziedzic to bring the oxygen and that they did so. Dziedzic, Ritt, and Altman all substantiated her claim that oxygen had been brought to the apartment. The fact that the family did not see the relatively small oxygen bottle in the hall outside the front door does not provide proof that oxygen was not brought to the apartment.[7]

It was undisputed that the patient had suffered from a collapsed lung within the previous year and that the family did not know what had caused it. The family had communicated this information to Ciechon on the first run. A collapsed lung is often associated with emphysema and the paramedics had been cautioned about the dangers of administering oxygen in cases of emphysema.[8] Actually, unknown to the family, and hence, to Ciechon, the patient's prior problem apparently was due to a burst bleb in the lung. In such a case, according to the testimony of Dr. Riff, a cardiology expert, oxygen would be "unlikely to have much beneficial effect." Thus this was not a clear-cut emergency medical situation where a course of treatment was unquestionably appropriate, as was evidenced at the hearing by the conflicting opinions of the two physicians who testified as to whether oxygen should have been administered given the symptoms and history of this patient. No after-the-fact diagnosis based on greater information should have obscured the reasonable judgment made at the time.

5. At the heart of all the charges was the family's complaint that the patient was not taken to the hospital, and the paramedics' testimony that the patient steadfastly refused to be taken to the hospital and could not be forced to go against his will. When Captain Ormond first talked to the patient's widow, she complained that she had wanted her husband taken to the hospital, but that he was not taken. In fact, members of the family told Ormond that they had begged the paramedics to take the patient to a hospital. If this were true and the paramedics refused, whereupon the patient expired, the charge would be serious indeed.

On the face of it, however, this version of events makes no sense. One of the primary functions of paramedics is to transport seriously ill patients to hospitals. There is no obvious motive not to perform this function. The paramedics' insistence that in fact the

---

paramedic call shows the widow asking the dispatcher, "What can I do for him [her husband]?" The dispatcher responded, "Call a doctor and we will send a man out as soon as possible. Okay?" The widow answered, "Okay." At the administrative hearing, the widow testified that she never called a doctor.

7. Dziedzic and Ritt both recalled that the oxygen was left in the hallway outside the apartment. This would explain why the family did not see the oxygen bottle. In addition, there was testimony that the dark-colored oxygen bottle could easily have been obscured by the dark-colored and bulky gear worn by the paramedics in the blizzard conditions.

8. Even Dr. Mesnick, the City's main witness at the hearing, admitted in his testimony that persons with certain types of lung disease should not be given oxygen or they might stop breathing. Dr. Riff testified that oxygen should never be administered to patients suffering from emphysema.

patient and the family refused an offer of transport to the hospital is confirmed by the tapes of the second call to the paramedics made by the patient's family:

Alarm Office: * * * The ambulance says he [Ciebien] didn't want to go to the hospital. If he doesn't want to go to the hospital we can't take him.

Caller [Mrs. Ciebien]: I wish he would go to the hospital. He is just breathing. He says he wants to go now.

Alarm Office: Madam this is no taxi cab service. Either he is going or he is not going to go. Which is it going to be?

Caller: Now he is going.

These tapes were not even checked by Captain Ormond or Dr. Mesnick during their investigation. Yet this undisputed evidence discloses the family's fabrication that on the first visit they begged to have the patient taken to the hospital or that the patient was willing to go. Ritt, Altman and Dziedzic all stated that the patient did not want to be transported to a hospital. It was undisputed that Ciechon ordered Altman and Dziedzic to bring a stretcher and to move the ambulance through the snow-filled street so as to be closer to the patient's apartment for his move to the hospital. Obviously the paramedics were doing everything in their power to transport the patient to a hospital, but he refused.

Indeed when the family testified at the administrative hearing, they no longer claimed to have begged for or even requested transportation to a hospital. At the hearing their story became that the word "hospital" was never mentioned by anyone—family or paramedics. They testified that they were waiting for the paramedics

to make the suggestion of going to the hospital, but that the suggestion never came.[9] The patient's widow admitted on cross-examination, however, that her husband did not request to go to the hospital and that she should have insisted to her husband that he go to the hospital.

Thus the record indicates that the family's reaction was unjustified and based on misunderstanding or lack of knowledge.[10] Nonetheless, the pressure applied by the family, directed primarily but quite unjustifiably at "the female," caused the City to panic instead of carrying on a rational investigation and hearing. The City obviously feared adverse publicity and possibly also sought to avert a civil lawsuit by offering to terminate Ciechon's continued employment as a sacrifice to that end.

The investigation of the charges against Ciechon was so incomplete and biased as to demonstrate clearly that the City made no effort to assess the incident fairly. Rather, the City seemed bent from the outset upon limiting its investigation in order to justify discharging Ciechon. The most obvious evidence of this conduct is that paramedic Ritt, whose duties and responsibilities were identical to Ciechon's, was never formally investigated and was only questioned about the incident in the most casual manner. The reports of Ritt and Altman, which supported Ciechon's version of events, were virtually ignored by the investigators. Dziedzic was never interviewed nor asked to write a report. None of the contemporaneous documentary evidence which supported Ciechon was sought by the investigators—neither the transcripts of the two telephone calls by the patient's family seeking par-

---

**9.** There is further evidence supporting Ciechon's position regarding hospital transportation. Ciechon had said that the patient on the first visit was not in pain, and had talked and even joked with her about how stubborn he was, having been born on St. Patrick's Day. The paramedics finally gave up trying to talk the patient into going to the hospital when he told them "I have been in hospitals too many times." The family members confirmed that on the first visit, the patient was suffering no pain; that the patient was stubborn; and that he was born on St. Patrick's Day. When asked

at the hearing why the patient and Ciechon had been talking about the patient's stubbornness if it was not in relation to his refusal to go to the hospital, the family could give no reason.

**10.** The absence of substantial evidence to support the charges against Ciechon approaches the kind of arbitrary, irrational government action condemned by the Supreme Court in *Schware v. Board of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796. Because we find that due process was violated based on other reasons, we need not address this issue.

amedic assistance nor the ambulance journal which recorded the call and its disposition. Moreover, testimony presented by the City at the Personnel Board hearing illustrates the improper motives with which the City conducted these proceedings. Dr. Mesnick was the primary witness against Ciechon. His testimony consisted of the results of his perfunctory investigation, countless unwarranted presumptions, and his personal opinions as to Ciechon's performance. His own testimony betrays a considerable lack of thoroughness in his investigation: not only did he never question paramedic Ritt, but, for example, he never looked at Ciechon's personnel file. Most seriously, Mesnick's medical opinions were based on a view of events under which he characterized the patient's problems as "acute decompensation," *i.e.*, an obvious medical emergency requiring immediate stabilization. Not even the family so characterized the patient's condition on the first ambulance run. Yet the hearing officer unqualifiedly credited Mesnick's testimony on medical matters in dispute in this case. Finally, neither the initial investigator, Ormond, nor the Fire Commissioner recommended discharge when the charges were made against Ciechon.[11] Yet by the time of the hearing her discharge was not only sought, but, according to the family, was virtually assured.

Given these facts, we have no trouble concluding that in response to pressure from the Ciebien family and fearful of publicity, the City misused its disciplinary procedures to effect Ciechon's removal on charges unsupported by the evidence. By so misusing its own procedures and by permitting itself to be so manipulated by the family, the City deprived Ciechon of due process of law. *Olshock v. Village of Skokie*, 541 F.2d 1254, 1257–58 (7th Cir. 1976).

The transgression of the due process clause becomes plainer upon consideration of the irregular administrative procedures employed. Although Section 25.1–6 of the Municipal Code[12] requires that charges against a career civil service employee be brought "by proper authority," most of these were brought instead by the Chicago Corporation Counsel's staff, which also represented the trial agency, *viz.*, the Personnel Board and all the defendants, including the initial charging party Albrecht—obviously a direct conflict in interest. Moreover, as shown in Rule XVI, Section 4(d), of the Rules and Regulations of the Chicago Personnel Board,[13] a disciplinary action is to be brought "by the employee's department

---

**11.** In addition, none of the officials who testified knew who had prepared additional charges against Ciechon in the period between her initial suspension and the hearing.

**12.** That Section provides:

The Personnel Board, a member thereof, or a hearing officer appointed by the Board shall conduct a hearing of all charges brought against any career service employee by proper authority for purposes of discharge, demotion, or suspension for a period of more than thirty days. The Personnel Board shall provide by rule for review by the Board, a member thereof, or hearing officer of suspensions not exceeding thirty days. The Personnel Board, any of its members, or a hearing officer appointed by the Board may administer oaths and secure by subpoena both the evidence and witnesses for the production of relevant books and papers. All proceedings before the Board, a member thereof, or the hearing officer shall be recorded. The findings and decision of a member of the Board or hearing officer shall be certified to the Personnel Board, which may ac-

cept or reject the findings and decision or may require further hearing before the Board. After the Board accepts the findings and decision of its member or hearing officer, or after a hearing by the Personnel Board, it shall certify the findings and decision to the Director of Personnel who shall then notify the appropriate appointing authority and said appointing authority shall then enforce the findings and decision forthwith. Nothing in this section limits the power of the appointing authority to suspend a subordinate for a reasonable period not exceeding thirty days pursuant to the rules of the Department of Personnel.

**13.** That Section provides:

*Approval, Disapproval or Modification of Disciplinary Action*
The Board, its members, or its appointed hearing officer may approve or disapprove the disciplinary action sought by the employee's department head, or may increase or reduce the severity of the disciplinary action as the facts warrant.

head," here Fire Commissioner Albrecht, yet most of the charges were determined by the Corporation Counsel's Office. (The additional charges spawned by that Office occurred on March 5 and 29, 1979, and April 16 and 24, 1979.) Although the same Rule permits the Board to "approve or disapprove the disciplinary action sought by the employee's department head," Commissioner Albrecht never specified what disciplinary action, if any, he wanted the Board to approve. Also in violation of that Rule the Chairman of the Personnel Board was the one who sought plaintiff's discharge. All these irregularities add up to a case slanted from the start against plaintiff, heard by a kangaroo court, and denying her due process.[14] See *Wakinekona v. Olim*, 664 F.2d 708, 712 (9th Cir. 1981), certiorari granted, —— U.S. ——, 102 S.Ct. 2294, 73 L.Ed.2d 1299 (1982). As that case demonstrates, such loaded proceedings cannot pass the muster of the due process clause. Instead they show that "the public employer was motivated by a desire * * * to penalize * * an employee's" property interest in her job (note 3 *supra*) and therefore are correctable under the due process clause. See *Bishop v. Wood*, 426 U.S. 341, 350, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684; cf. *Schware v. Board of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796.

Because of our holding that the due process clause was violated by a misuse of the City's disciplinary procedures, we need not consider plaintiff's argument that the Personnel Board violated the due process clause by deciding without sufficient supporting evidence that plaintiff should be discharged.

B. *Equal Protection Violation*

■ The disciplinary proceedings against Ciechon also constituted a denial of equal protection of the law because they represented an arbitrary, irrational decision to discriminate among the two paramedics, Ciechon and Ritt, who were equally responsible for the welfare of the patient on all ambulance runs. Thus two persons similarly situated, in that they experienced the same set of circumstances and were equally responsible for patient assessment and treatment, were treated absolutely differently. Ciechon was charged with failure to perform her duties and discharged; Ritt was never charged or disciplined in any fashion. Since the discrimination was intentional, the equal protection clause was violated. *United States v. Falk*, 479 F.2d 616, 619 (7th Cir. 1973) (en banc).

■ Equal protection demands at a minimum that a municipality must apply its laws in a rational and nonarbitrary way. *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 1072–73, 30 L.Ed. 220; *French v. Heyne*, 547 F.2d 994, 997 (7th Cir. 1976). This requires a showing that its application of the law "rationally furthers some legitimate, articulated state purpose and therefore does not constitute invidious discrimination." *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16; see also *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 172, 92 S.Ct. 1400, 1405, 31 L.Ed.2d 768; *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491. This does not mean that error or mistake in the application of the law gives rise to an equal protection claim. *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497.[15] Rather, it protects against in-

---

**14.** *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712, is of no aid to defendants. There the Court held that the combination of investigatory and adjudicative functions in a state medical examining board was not *per se* evidence of bias which would violate due process. 421 U.S. at 47–55, 95 S.Ct. at 1464–1468. Here not only did the same counsel represent both the prosecuting agency and the adjudicatory body, but the Municipal Code and the Rules of the Personnel Board themselves sepa-

rate the prosecutorial and adjudicatory functions. See *Staton v. Mayes*, 552 F.2d 908, 913, 914 (10th Cir. 1977).

**15.** We note that the deliberate, intentional conduct here distinguishes this case from *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684, which the City cites for the proposition that courts should not interfere with personnel decisions of government agencies. *Bishop* certainly stands for the proposition that courts cannot review every mistake made in personnel

tentional invidious discrimination by the state against persons similarly situated. *Id.*

We have consistently applied these principles which are at the heart of the equal protection guarantee to protect against arbitrary government conduct. Thus in *Olshock v. Village of Skokie*, 541 F.2d 1254 (7th Cir. 1976), this Court found equal protection violated when policemen who engaged in a protest action were differentially disciplined. The apparent basis of distinction was that those who were represented in a personnel hearing by counsel were discharged, while those who were not represented were only suspended. Similarly, in two prisoner cases, one involving a work-release program and one involving an interprison transfer, we found that an equal protection claim was stated where inmates asserted deliberate and arbitrary denial of hearing procedures guaranteed to all inmates. *Stringer v. Rowe*, 616 F.2d 993 (7th Cir. 1980); *Durso v. Rowe*, 579 F.2d 1365 (7th Cir. 1978), certiorari denied, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82; see also *Zeigler v. Jackson*, 638 F.2d 776, 779 (5th Cir. 1981); *Gosney v. Sonora Independent School District*, 603 F.2d 522, 527 (5th Cir. 1979).

Analysis of the facts presented in this case yields clear and convincing evidence of invidious discrimination. Paramedics Ciechon and Ritt were equally responsible for patient assessment and treatment on all ambulance runs, including that to the Ciebien household. Yet the City chose to charge and discipline only Ciechon. This choice was not made out of error, neglect, or mistake. Rather, it was an intentional act with no rational basis for such discrimination. Ritt either deserved to be discharged as Ciechon was, or Ciechon, like Ritt, deserved to be completely vindicated of all charges. There was no possible justification for treating them differently.[16]

The Chicago Fire Department has no written rules as to which paramedic on an ambulance team is in charge. The teams divide among themselves the work on each run. In this case Ciechon and Ritt found a patient who had been outside in the cold and snow, chopping ice, who was short of breath. Ciechon took his pulse and found it to be strong and regular (90); she checked his respiration and found it to be normal (20); Ritt examined the patient's lungs; and both Ritt and Ciechon took the patient's medical history and examined his medications. The patient complained of no pain; he was warm and dry, not cool and clammy; his color was not bluish nor bad; and although he was short of breath, there were no rales nor undue gasping, nor any neck vein distensions. He was alert, talking, and jocular; and he adamantly refused to go to the hospital. One diagnosis was that his condition would reverse itself and his breathing would become normal. In fact, there was a fairly good chance the patient would recover. And unless he would agree to go to the hospital, there was little more the paramedics could do for him.

decisions. *Bishop* expressly does not include deliberate, arbitrary personnel decisions such as are at issue here, 426 U.S. at 350, 96 S.Ct. at 2080, and indeed *Snowden* holds to the contrary.

16. The City argues that the decision to discipline only Ciechon is permissible under the concept of selective prosecution. That concept has normally arisen in criminal cases where it is alleged that a particular individual was prosecuted while others equally guilty were not. See *United States v. Blitstein*, 626 F.2d 774, 782 (10th Cir. 1980), certiorari denied, 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828. Selective prosecution is permissible as long as it is not based on clearly impermissible grounds such as discrimination on the basis of race, religion, the exercise of first amendment rights, or bad faith. *Id.* at 782. Even if we were to extend this standard to civil cases, see *McLean v. Rochford*, 404 F.Supp. 191, 199 (N.D.Ill.1975), an issue on which we intimate no opinion, that standard would be satisfied by the facts of this case. Ciechon has convincingly argued, and the record clearly demonstrates, that the City's decision to discipline only her was made in response to pressure by the Ciebien family and media and without the semblance of an objective investigation. Such impermissible motivation constitutes bad faith that removes the City's actions from the realm of discretionary selective prosecution. *United States v. Falk*, 479 F.2d 616, 618–19, 624 (7th Cir. 1973) (en banc).

Although the paramedics did not give the patient oxygen, this was a decision made by both Ritt and Ciechon and supportable as to a patient like Ciebien with a lung problem. In regard to the ultimate decision of whether to leave the patient, it was Ritt who determined that "he is okay, he is going to be all right."

The only evidence in the record which might explain why Ritt and Ciechon were treated differently is a February 12, 1979, letter sent to Captain Ormond from Dr. Jack B. Franaszek, Associate Director of the Department of Emergency Medicine at the University of Chicago Hospital. Copies of the letter were sent to Mary Juric, R.N., Frank J. Baker, M.D., and Richard M. Ritt. The letter read in part:

> ... Mr. Ritt is a paramedic who is exceptionally well thought of by Ms. Juric, our coordinator, and myself. In reviewing his file, one finds *excellent* documentation of his in-field and in-hospital performance. I know that he is also well respected by his colleagues and has our full support.

Stip. Exh. 30 (emphasis in original). The Franaszek letter regarding Ritt was not produced during discovery, but came to light in Dr. Mesnick's possession on the witness stand during the administrative hearing. Mesnick testified that it was a document he had used to prepare himself for the hearing. In fact, Mesnick was so conscious of Ritt that at least three times during his testimony he volunteered what a fine paramedic Ritt was.

The district court, however, characterized this as a "protection letter." The letter indeed tends to explain why Ciechon was the scapegoat and Ritt was the sacred cow. The letter also explains Mesnick's impassioned denunciation of Ciechon while carefully avoiding tarring Ritt with the same brush and in fact going out of his way to heap praise upon him.

There is no scenario, however, that would absolve Ritt while condemning Ciechon. The only differences between them were that he had three months experience while she had three years; and she was, according to the testimony of the family, somewhat more attentive to the patient than he was. Responsibility for the patient, however, was co-equal, and nothing in the rules or customs of the Chicago Fire Department would differentiate between paramedics on the basis of experience or time spent with the patient. Nor could either paramedic passively accede to known misdiagnosis or mismanagement of the patient. Ritt and Ciechon were equally responsible for the patient's welfare, and on the record it is undisputed that Ritt divided the medical tasks with Ciechon and shared in the diagnosis. Ritt's version of how he and Ciechon handled the patient, if believed by his superiors, would exonerate both himself and Ciechon from any charge of wrongdoing, since it indicated that they had used their best efforts to treat the patient. If Ritt were disbelieved, then he would be guilty not only of inappropriate behavior, but also of perjury, for fabricating a story to cover himself and Ciechon. See Tr. 5/29/79, 39.

The unequal treatment of Ciechon and Ritt was unreasonable and arbitrary and deprived Ciechon of equal protection of the law. See *Olshock v. Village of Skokie*, 541 F.2d 1254, 1260 (7th Cir. 1976). Since the City had not even a rational basis for its disparate treatment of Ciechon and Ritt, no defense to the equal protection clause has been made out. Accordingly, we affirm the judgment of the district court on this additional ground.

### III

Pursuant to 42 U.S.C. § 1988 (which was enacted as Section 2 of the Civil Rights Attorney's Fees Awards Act of 1976, 90 Stat. 2641) the district court awarded plaintiff's counsel $20,000 for legal services rendered in the judicial and administrative proceedings. The final issue raised by the City is whether the district court abused its discretion by awarding attorneys' fees for time spent by counsel representing Ciechon before the Personnel Board. The district court relied on *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723, to award fees for counsel time spent in the administrative hearing.

We agree with the district court that *New York Gaslight* is dispositive. *New York Gaslight* involved the issue whether attorneys' fees could properly be awarded under Title VII for time spent in state administrative and judicial proceedings. The Court there held that such an award of fees was proper under Section 706(k) of Title VII, 42 U.S.C. § 2000e–5(k). 447 U.S. at 66, 100 S.Ct. at 2032. The Court found that "Congress' use of the broadly disjunctive phrase 'action or proceeding'" in the statute clearly indicated fees were to include administrative proceedings. *Id.* at 61, 100 S.Ct. at 2029. Furthermore, the Court pointed out that the enforcement scheme of the statute mandated that plaintiffs first seek relief in state proceedings. *Id.* at 63–64, 100 S.Ct. at 2030–2031. To require such action but not provide compensation for counsel would undercut that scheme and encourage bypassing state procedures. *Id.* at 66 n.6, 100 S.Ct. at 2032 n.6; see also *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 765–67 (7th Cir. 1982); *Aerizaga v. Quern*, No. 77 C 276 slip op. at ·2 (N.D.Ill.1976) (Decker, J.).

We see no reason not to apply the decisions in *New York Gaslight* and *Chrapliwy* to permit the award of attorneys' fees here under Section 1988 for work performed at a related administrative proceeding. The language of Section 1988 [17] includes the same phrasing, "action or proceeding," that the Supreme Court construed in *New York Gaslight* and that we construed in *Chrapliwy*. Furthermore, as the *Gaslight* Court pointed out in a footnote to its opinion, Section 1988 is "similar in purpose and design to Title VII's fee provision." *Id.* at 71, n.9, 100 S.Ct. at 2034, n.9. The interest served by encouraging vigorous representation at an administrative proceeding is the same interest as that recognized by the Supreme Court in *New York Gaslight*, and by this court in *Chrapliwy*, in the Title VII statutory scheme of enforce-

ment. Indeed, the legislative history of Section 1988 states that "[i]t is intended that the standards for awarding fees be generally the same as under the fee provisions of the 1964 Civil Rights Act [the statute enacting Title VII]." S.Rep.No.94–1011, 94th Cong., 2d Sess. 4, reprinted in [1976] U.S.Code Cong. & Ad.News 5908, 5912. Thus courts have freely applied Title VII attorneys' fees precedents to Section 1988 actions. See, *e.g.*, *Sullivan v. Commonwealth of Pennsylvania Department of Labor & Industry*, 663 F.2d 443, 447 and n.5 (3d Cir. 1981), certiorari denied, —— U.S. ——, 102 S.Ct. 1716, 72 L.Ed.2d 138.

Our only inquiry, then, is whether the district court properly exercised its discretion in awarding these fees. The record before the Court indicates that counsel vigorously represented Ciechon throughout the administrative proceeding. She repeatedly raised objections to the procedures used and the evidence presented in the hearing, thereby establishing a record for the constitutional claims in the § 1983 action. Lack of due process was specifically raised and equal protection at least inferentially raised, thus warranting relief under 42 U.S.C. § 1988. The district court properly exercised its discretion in awarding attorneys' fees in this case.

The judgment of August 28, 1980, is affirmed.

---

**17.** Section 1988 reads in pertinent part:

In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
42 U.S.C. § 1988.