2022 IL App (1st) 201231-U

FIFTH DIVISION
March 11, 2022

No. 1-20-1231

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| ROBERT RIALMO, | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID O. BROWN, Superintendent of Police of the CITY OF CHICAGO, and THE POLICE BOARD OF THE CITY OF CHICAGO, | ) | No. 19 CH 13435 |
| | ) | |
| Defendants | ) | |
| | ) | |
| (David O. Brown, Superintendent of Police of the City of Chicago, Defendant-Appellee). | ) | Honorable Neil H. Cohen, Judge Presiding. |
| | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Delort and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1   *Held:*   Judicial and collateral estoppel did not apply; Police Board's findings were not against the manifest weight of the evidence; there was cause for an officer's discharge; disciplinary process did not violate the officer's due process rights; affirmed.

¶ 2    After a hearing, the Police Board of the City of Chicago (Board) discharged plaintiff, Robert Rialmo, from his position as a Chicago police officer. The circuit court of Cook County affirmed on administrative review. On appeal, Rialmo contends that (1) the circuit court applied an incorrect standard of review, (2) judicial estoppel and collateral estoppel should have barred the City of Chicago defendants (the City) from taking different positions and relitigating issues that were decided in previous civil suits, (3) the Board's findings were against the manifest weight of the evidence, (4) Rialmo's discharge was without cause, and (5) several aspects of the disciplinary process violated Rialmo's due process rights. We affirm the Board's decision to discharge Rialmo.

¶ 3                                    I. BACKGROUND

¶ 4    On December 26, 2015, shortly after 4 a.m., Rialmo and his partner, Anthony LaPalermo, were dispatched to respond to a domestic dispute at 4710 West Erie in Chicago. A resident, Bettie Jones, answered the door and told the officers, "It's upstairs." A 19-year-old man, Quintonio LeGrier, came down the steps with a metal baseball bat. Rialmo fired shots at LeGrier, who died from his injuries. Jones was shot and killed as well. The Jones and LeGrier estates brought separate civil suits against Rialmo and the City. The Jones suit settled for $16 million. The LeGrier suit proceeded to a jury trial in June 2018, where Rialmo and the City prevailed after a jury determined via special interrogatory that Rialmo reasonably believed that deadly force against LeGrier was necessary to prevent imminent death or great bodily harm to himself or LaPalermo.

¶ 5                                    A. Jones Suit

¶ 6     Among the causes of action alleged by the Jones estate was wrongful death based on reckless and willful and wanton conduct. In response to a motion for partial summary judgment,

the City asserted in part that the facts and circumstances did not establish that Rialmo was willful and wanton as a matter of law and that there were disputed material issues that a jury needed to scrutinize to determine whether a finding of willful and wanton conduct was appropriate. The City referred to Rialmo's deposition testimony that LeGrier swung a bat at his head and that Rialmo believed he was about to be struck with the bat. The City also cited Rialmo's deposition testimony that LeGrier was two to three feet away from him, with the bat cocked to swing at him, when he fired. As noted above, the Jones civil suit did not go to trial and was settled for $16 million.

¶ 7                                                B. LeGrier Trial

¶ 8     The LeGrier trial and Board proceedings refer to the layout of 4710 West Erie, and so we will briefly describe it. From the sidewalk, a walkway led to three stairs, at the top of which was a porch. At the end of the porch was an exterior door that opened to a vestibule. Inside the vestibule were two interior doors: one on the left that led to Jones's apartment, and one on the right that opened to a staircase leading to the apartment of LeGrier's father on the second floor.

¶ 9     Below is a summary of the testimony in the record from the LeGrier trial.

¶ 10    On questioning by the LeGrier plaintiffs, Rialmo testified that before he arrived at LeGrier's building, he knew there was a domestic disturbance and LaPalermo told him there might be somebody with a baseball bat. Rialmo did not know that LeGrier had called 911 and agreed that he and LaPalermo did not have a game plan. When the officers arrived, Jones answered the door and said, "It's upstairs." Rialmo took a step into the vestibule and heard someone—later known to be LeGrier—coming down the stairs. Jones was still in the vestibule. Rialmo took a few steps back onto the porch and told LeGrier 10 times to drop the bat he was holding. LeGrier lifted the bat over his shoulder and came toward Rialmo, swinging the bat

downward while on the porch. After LeGrier continued to come towards Rialmo and cocked the bat back, Rialmo drew his gun and fired approximately seven shots, constantly retreating while shooting. LeGrier turned and fell face down in the vestibule. Jones also fell inside the vestibule. Rialmo was on the walkway when he fired his first shot and closer to the sidewalk when he fired the last shot. Also, LeGrier was approximately two to three feet away when Rialmo started shooting.

¶ 11    Emanuel Kapelsohn, a consultant on the use of force, testified as an expert for the City that Rialmo's use of force was consistent with standard police training in Chicago and elsewhere. Kapelsohn stated that the baseball bat gave LeGrier the ability to cause death or serious bodily harm. LeGrier had the opportunity to do so by being close enough to the officer. LeGrier's intent to do deadly harm was evident by coming toward the officer and/or not dropping the bat after Rialmo told LeGrier to do so multiple times. Kapelsohn also stated that LeGrier did not have to actually swing the bat to threaten deadly force. According to Kapelsohn, "if someone comes out, under these circumstances, with a bat in their hands and comes towards you and doesn't drop it, you don't have to wait 'til the person swings it."

¶ 12    Kapelsohn explained why Rialmo did not see Jones when he fired. LeGrier was in front of Jones and the exterior door was partly closed, which partly obscured anything inside the vestibule. Also, under a concept known as tunnel vision, when a person has a deadly weapon pointed at him, that person has an overwhelming tendency to focus his vision on that deadly weapon. Kapelsohn also discussed the 21-foot rule, which provides that from a standing start, a person can cover 21 feet in about a second and a half. Kapelsohn stated that whether LeGrier was on the porch or at the top of the stairs, and whether Rialmo was on the stairs, on the bottom of the stairs, or further towards the street, "all of those things are within a very dangerous zone.

They're within the zone of easy attack of someone with a baseball bat." According to Kapelsohn, an officer is compelled to fire when faced with a baseball bat close to him, held by someone who will not drop it. He added that officers are in situations all the time where they must fire while other people are present or occupied vehicles are behind them. To an extent, Rialmo had to consider what was behind LeGrier when he fired, but Rialmo did not see Jones in the background and believed she had returned to her apartment.

¶ 13   Dr. Judy Melinek, a forensic pathologist, testified as an expert for the plaintiffs that most of the wounds were in LeGrier's back. Based on Dr. Melinek's analysis, LeGrier's left arm was down when he was shot and his wounds were inconsistent with testimony that he was holding a baseball bat over his right shoulder at the time of the shooting. Dr. Melinek further opined that LeGrier was in the vestibule when he collapsed. A gunshot wound went through his spine and spinal cord, so he would have collapsed where he was standing. Dr. Melinek also stated that based on the absence of gunshot residue on LeGrier's clothing or skin, Rialmo fired from more than two or three feet away.

¶ 14   Dr. Hilary McElligott, the chief forensic pathologist for Du Page County, testified as an expert for the City that the nature of LeGrier's injuries were consistent with LeGrier approaching Rialmo with his left side facing Rialmo, as if LeGrier were swinging a bat. Dr. McElligott also stated that a gunshot wound to LeGrier's left arm was consistent with his arm raised to swing a bat. However, there was no way to know for certain if LeGrier's arm was up or down when he was shot.

¶ 15   The record also contains the discovery deposition of Dr. Kristen Escobar Alvarenga, the assistant Cook County medical examiner who performed LeGrier's and Jones's autopsies. Dr. Alvarenga stated that because one of LeGrier's wounds was in his spinal cord, he would not have

been able to stand or walk after being shot there. Dr. Alvarenga had no opinions within a reasonable degree of medical certainty as to how LeGrier's arms were positioned at the time of the shooting. Dr. Alvarenga also stated that there was no evidence of any soot or stippling to LeGrier's body or clothing, which meant he was shot from more than four feet away.

¶ 16    In their closing argument, the LeGrier plaintiffs stated in part that LeGrier was not a threat to Rialmo. LeGrier was inside the building with his back facing Rialmo when he was shot, while Rialmo was on the walkway and moving backwards away from the building. The City objected to the plaintiffs' assertion in closing that Jones was part of the totality of the circumstances. The court stated that there were no claims in the case relating to Jones, but overruled the objection, "as she's part of the evidence in the case." Plaintiffs stated that Rialmo should have considered the backdrop, which included Jones, before shooting into an occupied building.

¶ 17    In its closing, the City stated in part that the trial was not for the purpose of determining any claims brought on Jones's behalf. There were also no claims related to Rialmo's training or any failure to equip, inform, or supervise him. The City asserted that it was reasonable for Rialmo to believe that he was about to be seriously injured or killed by LeGrier and it was "reasonable to shoot *** LeGrier under these circumstances." The City also discussed the testimony of a crime scene reconstructionist, Michael Knox, who had testified for the plaintiffs.[1] Knox did not reconstruct how far back LeGrier could be and still strike Rialmo with a bat because that "would destroy the plaintiffs' case." The City stated that

> "nobody can really argue that in a period of 5 to 6 seconds or 10 seconds, with Rialmo
> backing down these stairs and LeGrier running through this door, nobody can really

---

[1] Knox's trial testimony is not in the record.

argue that Rialmo wouldn't have been hit with the bat if he didn't fire because that's not reasonable. And that's why [Knox] didn't ask those kinds of questions."

Knox had stated that Rialmo was at least 10 feet back when he fired. The City asserted that for Knox's 10-foot calculation to work, the jury would have to believe that LeGrier sprinted down the stairs, reached the vestibule, and stopped, while Rialmo had enough time to move 10 feet away and then shoot. According to the City, "That makes no sense. It doesn't match anything." Rialmo "certainly can't call time out" and ask for a minute to move back. So, "shooting from a minimum of 10 feet away should be disregarded. It doesn't match up."

¶ 18    The City further stated that part of Knox's testimony "totally [destroyed] the idea that Rialmo was back here *** on the walkway firing shots." Reciting Knox's measurements, the City asserted, "That certainly sounds to me like *** Knox said that Officer Rialmo fired his last shot at the base of the stairs," which was consistent with Rialmo's and LaPalermo's accounts. The City recalled that according to LaPalermo, LeGrier came to rest halfway in and halfway out of the vestibule. Knox had stated that the paramedics had probably dragged LeGrier to that location, but no witnesses testified that occurred. The City also criticized the testimony of another one of the plaintiffs' experts, Charles Drago, who apparently testified that Rialmo should not have shot LeGrier because Jones was present.[2] The City stated that Drago did not consider that LeGrier "was seconds away from bashing Rialmo's head in."

¶ 19    The City turned to Kapelsohn's testimony about the 21-foot rule. The City stated that although Rialmo and LeGrier were not 21 feet away from each other, the 21-foot rule "illustrates what we've been talking about," which is that "anywhere in here [indicating] is the danger zone, anywhere in here is the strike zone." Counsel referenced Kapelsohn's opinion that

---

[2] Drago's trial testimony is not in the record.

"[w]hether or not *** LeGrier swung this bat at Rialmo, whether he swung it and came back up or whether he was just running like this, either way he's a deadly threat. The swing doesn't – you don't need that to be a deadly threat, because up here certainly indicates a swing is coming, and you don't have to wait for it and get hit or almost get hit before you protect yourself.

Whether the bat is up or down, whether the bat is here or here [indicating], whether the bat has been swung or not, at 5 feet, at 8 feet, at 21 feet, the person brandishing it is a deadly threat."

¶ 20    The City further noted that LaPalermo characterized the situation as an ambush. Also, LaPalermo's testimony "dispelled any notion that these guys didn't know what was happening at this house before they got there." According to LaPalermo, the officers learned that there were two different 911 callers, one of them was "Q", and the other "was in his room, and someone was outside with a bat." The City stated that "the idea that they weren't properly informed" was not a claim in the case, "[b]ut that information from LaPalermo completely dispels any notion that they were uninformed."

¶ 21    The court instructed the jury in part as follows:

"A police officer is justified in using force likely to cause death or great bodily harm only when he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another person.

* * *

Plaintiffs *** advance a wrongful death claim against defendants Robert Rialmo and City of Chicago. Plaintiffs claim that they were injured and sustained damage and that defendants were willful and wanton in the following respects:

Robert Rialmo intentionally shot Quintonio LeGrier and did so without legal justification.

\*\*\*

The Estate of Quintonio LeGrier \*\*\* advances a survival claim against defendants Robert Rialmo and the City of Chicago for Quintonio LeGrier's conscious pain and suffering prior to death. Plaintiff claims it was injured and sustained damage and that defendants were willful and wanton in the following respect:

Robert Rialmo intentionally shot Quintonio LeGrier and did so without legal justification."

¶ 22    The court instructed the jury that as to the LeGrier plaintiffs' wrongful death claim, the plaintiffs had the burden to prove each of the following:

"First, that the defendant Robert Rialmo was willful and wanton in that he shot Quintonio LeGrier, without legal justification.

Second, that the willful and wanton conduct of Robert Rialmo was a proximate cause of the death of Quintonio LeGrier.

Third, that the death of Quintonio LeGrier was a proximate cause of [plaintiffs'] \*\*\* damages."

¶ 23    The jury was also given a special interrogatory that read as follows:

"When Robert Rialmo used deadly force against Quintonio LeGrier, did Robert Rialmo reasonably believe that such force was necessary to prevent imminent death or great bodily harm to himself or Anthony LaPalermo?"

¶ 24    The jury found for the LeGrier plaintiffs on the wrongful death claim and awarded $1 million in damages. The jury also awarded the plaintiffs $50,000 for LeGrier's conscious pain and suffering. However, because the jury answered "yes" to the special interrogatory, the court found it was required to enter a verdict consistent with that answer. Judgment was entered in favor of Rialmo and the City.

¶ 25                    C. Police Board Proceedings

¶ 26                        1. Prehearing Matters

¶ 27    Approximately six months before the LeGrier trial, in December 2017, the Chief Administrator for the Civilian Office of Police Accountability (COPA) recommended that Rialmo be disciplined and separated from the police department. The Chief Administrator alleged in part that Rialmo (1) shot LeGrier without justification, (2) fired multiple times into a home occupied by persons who would be at risk of injury or death, (3) fired in the direction of Jones, which resulted in her death, and (4) shot Jones without justification.

¶ 28    The police superintendent disagreed with the Chief Administrator, and on April 11, 2018, COPA issued a request for review to the Board. A reviewing member of the Board, Eva-Dina Delgado, subsequently found that an evidentiary hearing was necessary to determine whether Rialmo violated the police department's rules of conduct. The Chief Administrator's disciplinary recommendation was deemed accepted by the police superintendent, and the reviewing Board member recused herself from the case.

¶ 29    Charges were filed against Rialmo on November 7, 2018, and alleged in part that

            "1. *** Officer Robert Rialmo, *** without justification, used force likely to

            cause death or great bodily harm without a reasonable belief that such force was

necessary when he fired his weapon one or more times in the direction of Bettie Jones, hitting Ms. Jones and causing her death.

> a. Thereby violating Rule 2, any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department; and/or,
>
> b. Thereby *** [violating] Rule 6, disobedience of an order or directive, whether written or oral; and/or,
>
> c. Thereby violating Rule 38, unlawful or unnecessary use or display of a weapon.

2. *** Officer Robert Rialmo *** fired his weapon one or more times in the direction of Bettie Jones, hitting Ms. Jones and causing her death.

> a. Thereby violating Rule 2, any action or conduct which impedes the Department's efforts to achieve its policy and goal or brings discredit upon the Department; and/or,
>
> b. Thereby violating Rule 10, inattention to duty; and/or,
>
> c. Thereby violating Rule 11, incompetency or inefficiency in the performance of duty; and/or,
>
> d. Thereby violating Rule 38, unlawful or unnecessary use or display of a weapon.

3. *** Officer Robert Rialmo *** fired his weapon one or more times into a home occupied by persons who would be at risk of injury or death.

>> a. Thereby violating Rule 2, any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department; and/or,
>>
>> b. Thereby violating Rule 10, inattention to duty; and/or,
>>
>> c. Thereby violating Rule 11, incompetency or inefficiency in the performance of duty; and/or,
>>
>> d. Thereby violating Rule 38, unlawful or unnecessary use or display of a weapon."

The superintendent recommended Rialmo's discharge from the police department.

¶ 30     During a prehearing proceeding on February 22, 2019, the hearing officer noted that Rialmo sought to elicit from the City "an expert report by a gentleman named Harrington. \*\*\* And the City has agreed to look into that." On May 13, 2019, the hearing officer stated that Harrington had been retained by a law firm that had represented COPA. Rialmo asserted that Harrington's report pertained to the propriety of his actions and that the law firm or COPA had the report. The City had apparently searched for the report and was told it did not exist, but the hearing officer stated that "we're going to leave no stone unturned." The City agreed to discuss the matter with the law firm and reach out to Harrington. If there was a report, the hearing officer would examine it *in camera* and assess whether it was exculpatory. By May 30, 2019, the City had secured copies of Harrington's documents and notes that the hearing officer then reviewed. The hearing officer stated that one potentially exculpatory email from Harrington written in June 2016 would be disclosed under a protective order. That email summarized a meeting attended by Harrington and various government and law enforcement representatives where a consensus was reached about the shooting. The Harrington email/report is not in the record.

¶ 31     On March 15, 2019, Rialmo filed a motion to dismiss the charges, asserting in part that the charges against him were barred by judicial estoppel. Rialmo stated that the City's defenses in the Jones and LeGrier suits were factually inconsistent with the present Board charges. Rialmo further asserted that the Board's charges were barred by collateral estoppel where, at the LeGrier trial, the City argued and presented evidence that Rialmo acted reasonably and with justification, which the jury accepted.

¶ 32     On April 25, 2019, the Board denied Rialmo's motion to dismiss. Among the Board members entering the order was John P. O'Malley, Jr. In part, the Board found that judicial estoppel did not apply because the Board charges focused on Rialmo's conduct as to Jones, and the LeGrier jury did not answer whether Rialmo's use of force against Jones was willful and wanton. The Board also found that collateral estoppel did not apply because the Board charges pertained to Jones or the firing of a weapon into a home, which differed from what was decided by the special interrogatory at the LeGrier trial.

¶ 33     On June 25, 2019, the hearing officer noted that Board member O'Malley had recused himself, "not feeling that there's any actual conflict of interest but an apparent conflict and so he will not participate in the decision on the case. And I have advised the parties as to why that's the case."

¶ 34     As a final prehearing matter, the parties addressed the City's motion *in limine* that the Harrington email was hearsay and could not be received as substantive evidence. Rialmo agreed, but stated that the email was relied on by Rialmo's expert and would be mentioned throughout the hearing. The City also asserted that it would be unfair to argue that COPA improperly handled the Harrington email, as the email was subject to a privilege in the civil trial. The City stated that it produced the email upon request in the Board proceeding. The hearing officer

agreed with the City, "particularly since the [s]uperintendent dug the document out at my request and gave it to me." The hearing officer did not "want argument about the process that led to the motion practice prior to the hearing." Rialmo's counsel noted its objection for the record, stating that "COPA fought tooth and nail not to allow that email to come out."

¶ 35                                    2. Evidentiary Hearing

¶ 36     In its opening statement, the City asserted in part that the matter at hand was whether, when Rialmo used deadly force, he used it recklessly. The City stated that "the mere presence of a bat does not create a situation in which deadly force is justified. The proximity of a bat to another person, however, is a key factor in deciding the appropriate level of force." The City also asserted that the testimony and evidence would show that "Rialmo acted recklessly and in reckless disregard for the very thing he swore to protect which was Bettie Jones'[s] life." In his opening statement, Rialmo contended in part that if the shooting of LeGrier was reasonable, then Jones's death was reasonable.

¶ 37     The evidence presented included the texts of the 911 calls that were transmitted to Rialmo and LaPalermo's vehicle. A dispatcher told the officers that the call was "comin' in as a domestic on 19 O something and on his bedroom door with a baseball bat." One call was from LeGrier's father, Antonio, who indicated that he needed police assistance and his 19-year-old son was carrying a baseball bat. LeGrier made a separate, though incoherent, 911 call that someone was threatening his life.

¶ 38     Rialmo testified as a witness for the City and stated in part as follows. After the officers arrived and approached the building, LaPalermo told Rialmo to be careful and that somebody might have a bat. Still, according to Rialmo, "[w]e didn't know what was going on inside to figure out a game plan. That's kind of how most domestic calls go on." After Rialmo knocked on

the door and rang the doorbell, Jones opened the door, said, "It's upstairs," and turned towards

her apartment. Rialmo took a step into the vestibule and heard someone—later known to be

LeGrier—charging down the stairs. LeGrier had an aluminum baseball bat raised above his head.

Rialmo retreated and yelled repeatedly at LeGrier to drop the bat, while LeGrier twice swung the

bat at Rialmo. Once Rialmo got to the bottom of the steps, he drew his weapon and fired seven

or eight shots, continuing to retreat as he fired. When Rialmo first fired, LeGrier was towards the

front of the porch. As Rialmo fired the last shot, LeGrier grabbed his chest, dropped the bat, and

turned towards the building. Rialmo had last seen Jones standing in the vestibule facing the

exterior door. When Rialmo went back to the porch to assess what happened, LeGrier was lying

in the vestibule with his feet on the porch. Jones was lying on her back next to him. Overall, the

closest Rialmo had been to LeGrier was about three feet away, when Rialmo was near the

threshold of the front door. At the end of the incident, Rialmo was about 8 to 10 feet away from

LeGrier.

¶ 39     LaPalermo testified that on December 26, the officers received a call on the dispatch

radio that a father was locked in his bedroom, barricaded, and his son was banging on the door

with a baseball bat. That information was posted on the computer monitor in the officers'

vehicle. After the officers arrived at the building and LeGrier emerged with a bat, LaPalmero

said, "Look out." LeGrier was on top of Rialmo. LaPalermo jumped backwards down the porch

stairs and moved into the grass that was off the walkway. LaPalermo ultimately ended up behind

a car. After he saw LeGrier fall, LaPalermo sent an alert for more cars.

¶ 40     Sergeant John Pardell, from the police department's education and training division,

testified that the police department does not recognize the 21-foot rule. Sergeant Pardell

explained that the rule is "not the truth for everybody in every situation." The department does

not "like being locked into a certain distance. *** [W]hat makes 21 the magic number? It could be 18, it could be 15, it could be 35. It's situational-specific."

¶ 41   Michael Gennaco, a police practices expert for the City, testified that the officers should have collected more information before approaching the building. The officers did not have the details of the nature of the 911 call and did not know to what degree the call was exigent. The officers could have asked dispatch to learn more from LeGrier's father or asked dispatch to connect them to him. Further, while driving to the building, the officers should have made a plan based on additional information they could have gathered. Because the officers did not make a plan, they were forced to improvise and react, "which is the worst situation you want an officer to be in." Gennaco further stated that Jones's presence had to be considered when determining whether deadly force was appropriate. Based on ringing the doorbell and interacting with her, Rialmo knew that Jones was next to or directly behind LeGrier. A reasonable officer would have taken more time to draw out LeGrier from the entranceway and away from Jones. Though this would have been riskier for Rialmo, "that's what we pay officers to do every day they put on a uniform." Gennaco would have approved using deadly force if LeGrier continued to be aggressive after the vestibule area was cleared and Jones was no longer in Rialmo's field of fire. Gennaco also discussed the 21-foot rule, which he stated was contested. While the concept was sound, "you can't have automatics like that in police science these days."

¶ 42   Kapelsohn, who had testified for the City in the LeGrier trial, testified in Rialmo's defense. Kapelsohn was qualified by the hearing officer as an expert in force science. Kapelsohn had reviewed a June 2016 email from Robert Harrington, stating that he and everyone else consulting on the case felt that the use of force was justified. Kapelsohn did not find fault with the extent of the officers' planning, stating that their plan was to respond to the address where

they had been dispatched and "do what they needed to do to protect life." Generally, officers never have complete information and the nature of responding to a domestic disturbance "is you've got to respond." Kapelsohn also defended the 21-foot rule, explaining that the rule communicates to officers that a person can reach them in a very short timeframe. Kapelsohn acknowledged that in some places, officers are improperly taught that as long as someone is within 21 feet of an officer and has a weapon, "you can just shoot them." Kapelsohn opined that it was not careless or reckless for Rialmo to fire in LeGrier's direction knowing that there was a possibly occupied residence behind him. Kapelsohn stated that Jones was 8 or 10 feet from Rialmo. Having visited the scene, Kapelsohn noted that there was nowhere one could fire without a residence nearby. Rialmo was faced with a deadly threat and had to respond immediately, or he would likely be killed or maimed. Kapelsohn stated that based on his timing, it takes about six seconds to say "drop the bat" 10 times.

¶ 43    The City entered into evidence Dr. Melinek's testimony from the LeGrier trial, while Rialmo entered into evidence Dr. McElligott's testimony. Also entered into evidence was Dr. Alvarenga's deposition testimony.

¶ 44    In its closing argument, the City asserted that Rialmo justifiably fired at LeGrier. Yet, even where an officer justifiably uses deadly force, he must do so reasonably, considering all of the circumstances. The City stated that the officers had no plan in place. Their planning consisted of LaPalermo telling Rialmo to watch out and that someone might have a bat. The officers "really made no effort to inform themselves about *** what they were going to face at 4710 West Erie before they got there and how they might be best equipped to respond to it." The City referred to Gennaco's testimony that the officers could have made better use of the time spent

driving to the building by trying to obtain additional information or discussing the information they had.

¶ 45    The City also asserted that, "[i]n addition to the fact that they really made no effort to prepare themselves on these facts firing seven to eight rounds from probably 10 to 12 feet away from where you just saw an innocent bystander standing is objectively unreasonable." Seconds before firing, Rialmo stood no more than a few feet from Jones "and at the time he fired his weapon[,] *** Jones was no more than probably seven or eight feet behind his intended target." It was not reasonable for Rialmo to fire multiple shots in Jones's direction, where seconds earlier she was close enough that Rialmo could have touched her. Whether or not Rialmo saw Jones when he fired, he knew Jones was there and needed to do something to remove her from the line of fire. Rialmo could have moved to the side or backed up. Rialmo had "a number of options available to him, but he had to do something. He can't stand there and fire on a line where you know you have an innocent victim." Lethal force was not out of the question. It was the manner of Rialmo's use of deadly force that was improper because Rialmo "shot directly on a line where he knew there was an innocent bystander." If Rialmo had positioned himself so that Jones was not in his line of fire, the City "wouldn't be critical of that."

¶ 46    The City also discussed the locations of Rialmo and LeGrier. The City estimated that LeGrier was probably towards the middle or back of the porch when he swung at Rialmo. The City believed that Rialmo had testified that he fired from the walkway. The hearing officer wanted to clarify the distance between Rialmo and LeGrier when Rialmo fired, asking, "But the porch being four feet could be two, three feet and then plus that distance?" The City responded that this was correct. The City stated that according to Rialmo, LeGrier was on the porch when he was shot, "but he couldn't have advanced too far because the testimony was he had spun to

his right, basically took a step and fell and that allowed him to make it all the way into the vestibule." The City also cited Rialmo's testimony that LeGrier landed with his body face down in the vestibule "either entirely into the vestibule or on the threshold or with his feet and ankles over the threshold and onto the porch."

¶ 47    In his closing, Rialmo characterized LeGrier's actions as a homicidal ambush and asserted that Rialmo was justified in using deadly force. Rialmo acknowledged that if he saw Jones and knew there was a possibility she could be shot, he had to consider that and assess his options. However, Rialmo did not see Jones and did not expect that she was in his line of fire. Rialmo also stated that Harrington opined, with the consensus of other law enforcement agencies, that Rialmo's use of force was justified. No other retained expert by COPA rendered an opinion that Rialmo's use of force was unjustified.

¶ 48    In rebuttal, the City recalled that Kapelsohn stated it took about six seconds to say "drop the bat" 10 times. The City noted that Kapelsohn was a great proponent of the 21-foot rule, which the police department did not teach or credit, but "the six second issue is important because a lot can happen in six seconds." Rialmo moved from where LeGrier initially was, to where LeGrier swung twice at him, "to where by the time he finally finished shooting according to his account they're probably 10, 11 feet apart."

¶ 49    On October 17, 2019, the Board entered a written order finding Rialmo guilty of all charges and discharging him from his position as a police officer. The Board noted that its Board members read and reviewed the record of the proceedings and viewed the video recording of the entire evidentiary hearing. The hearing officer made an oral report to and conferred with the Board.

¶ 50    The Board explained which witnesses it found credible. In an effort to view the evidence in the light most favorable to Rialmo, the Board adopted his account as entirely true. The Board credited the testimony of Dr. Alvarenga, who was the disinterested medical examiner who performed the autopsies. The Board also credited Dr. Melinek's testimony, but not Dr. McElligott's because her testimony was equivocal and inconsistent with Rialmo's testimony on the point that LeGrier was shot as he was taking a right-handed swing with the bat. The Board did not need to decide whether to credit Kapelsohn or Gennaco on the matter of the officers' planning. It credited Gennaco's testimony that the officers could have tactically repositioned themselves so that Jones was no longer in the line of fire. Per Rialmo's account, he was 8 to 10 feet from LeGrier when he fired his weapon, though the Board suggested that LeGrier might have been even farther away. Based on the trajectory of LeGrier's wounds, he was not facing Rialmo with the bat above his head. LaPalermo repositioned to a safer distance, and Rialmo could have done the same, as he was on the walkway with a clear path of repositioning available to him. Instead, Rialmo made the objectively unreasonable decision to fire even though he knew that Jones was in his line of fire. Whether or not Rialmo saw Jones at the exact moment he fired, Rialmo knew or reasonably should have known that Jones was in his line of fire.

¶ 51    The Board made the following findings of fact. When LeGrier first emerged from the stairwell, the officers were standing together at the top of the porch. After Rialmo fired, LaPalermo tactically repositioned himself behind a car that was parked in the street. At the time of the shooting, (1) Rialmo had reached the bottom of the stairs leading down from the porch and was standing on the walkway, (2) Rialmo was approximately 8 to 10 feet from LeGrier, (3) LeGrier was neither charging Rialmo nor actively swinging the bat at him, and (4) Jones was standing behind LeGrier, and Rialmo knew or had reason to know of her presence. The Board

noted that in Rialmo's civil trial testimony, Rialmo made clear "that the bottom of the steps meant the walkway leading away from the building, and that is where he was when he fired." The Board further found that Jones was an innocent bystander and she was killed as a result of a direct shot fired from Rialmo's service weapon.

¶ 52    The Board noted that the police department's general orders in effect at the time of the incident stated that officers may "use an amount of force reasonably necessary based on the totality of the circumstances to *** protect themselves or others from injury." The general orders also required officers to consider the presence of innocent bystanders when deciding whether to use deadly force. The Board acknowledged that a civil jury determined that Rialmo reasonably believed it was necessary to use deadly force against LeGrier to prevent death or great bodily harm to himself or his partner. However, the jury was asked only whether the use of force was reasonable as to LeGrier and was not asked to determine whether the force was necessary based on the totality of the circumstances. The Board stated that while the use of deadly force may be reasonable to stop a man from wielding a bat at an officer, what is reasonable or necessary must be adjusted based on the totality of the facts of the case. Here, Rialmo's use of deadly force was not reasonable or necessary under the totality of the circumstances given Jones's close proximity to LeGrier when the shots were fired. Rialmo had the obligation and ability to tactically reposition himself before he fired shots to protect innocent bystanders. The Board noted that Rialmo waited to fire shots until he was at the bottom of the stairs and on the walkway. When the shots were fired, LeGrier had stopped actively swinging his bat and was standing straight up, with his back or side facing Rialmo.

¶ 53    The Board found that Rialmo was guilty of violating four police department rules and the City had proven the charges by a preponderance of the evidence. The police department and

residents of Chicago "rightfully demand that police officers protect those around them." Rialmo's decision to place Jones in peril when he was at least 8 to 10 feet from LeGrier and had a way to reposition himself, as well as his guilt on other charges, amounted to conduct that was sufficiently serious to constitute a substantial shortcoming that rendered his continuance in office detrimental to the discipline and efficiency of the police department, and was good cause for him to no longer occupy his office.

¶ 54                             3. Motion to Reconsider

¶ 55    Rialmo filed a motion to reconsider and vacate the Board's denial of his motion to dismiss and its finding of guilt. In part, Rialmo asserted that judicial estoppel applied where the City took factually inconsistent positions in the civil litigation and the Board proceedings. Further, the City was collaterally estopped from relitigating the facts of the incident. Rialmo also stated that there was insufficient evidence to support a guilty finding. Further, several aspects of the disciplinary process violated his due process rights.

¶ 56    On November 21, 2019, the Board found that it lacked jurisdiction to consider Rialmo's posthearing motion because the Board's procedures did not provide for motions to reconsider final decisions.

¶ 57                     D. Administrative Review in the Circuit Court

¶ 58    Rialmo filed a complaint for administrative review in the circuit court of Cook County. In part, Rialmo asserted that the City put forth inconsistent factual and legal positions, triggering judicial and collateral estoppel. Rialmo further stated that the Board's decision was against the manifest weight of the evidence and the disciplinary process violated his due process rights. Rialmo's complaint included links to files containing the minutes of Board meetings where

public comment was given about the subject incident, as well as examples of specific comments made to the Board.

¶ 59 On October 22, 2020, the circuit court affirmed the Board's decision. In a written order, the court found that the Board's findings that the charges against Rialmo were not barred by judicial or collateral estoppel were not clearly erroneous. Also, the Board's factual findings were not against the manifest weight of the evidence. The Board had good cause to terminate Rialmo's employment and Rialmo did not show that his due process rights were violated.

¶ 60 Rialmo timely appealed.

¶ 61 II. ANALYSIS

¶ 62 On administrative review, we review the final decision of the agency and not the decision of the circuit court. *Rios v. Cook County Sheriff's Merit Board*, 2020 IL App (1st) 191399, ¶ 29. So, we will not address Rialmo's challenges to the circuit court's decision. We turn to Rialmo's arguments that the Board's decision was incorrect because (1) judicial estoppel barred the City from taking different positions than were taken in the Jones suit and LeGrier trial, (2) collateral estoppel barred the City from relitigating issues that were decided in the LeGrier trial, (3) the Board's findings were against the manifest weight of the evidence, (3) Rialmo's discharge was without cause, and (4) several aspects of the disciplinary process violated Rialmo's due process rights.

¶ 63 A. Judicial Estoppel

¶ 64 Rialmo contends that judicial estoppel barred the City from taking positions at the Board hearing that were factually inconsistent with positions it asserted in the Jones suit and LeGrier trial. Judicial estoppel is an equitable doctrine invoked by the court at its discretion. *Johnson v. Fuller Family Holdings, LLC*, 2017 IL App (1st) 162130, ¶ 33. Its purpose "is to protect the

integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." (Internal quotation marks omitted.) *Seymour v. Collins*, 2015 IL 118432, ¶ 36 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001)). For the doctrine to apply, the party to be estopped must have (1) taken two positions, (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending the trier of fact to accept the truth of the facts alleged, and (5) succeeded in the first proceeding and received some benefit from it. *Batson v. Oak Tree, Ltd.*, 2013 IL App (1st) 123071, ¶ 23. The two positions "must be totally inconsistent—the truth of one must necessarily preclude the truth of the other." *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754, ¶ 68.

¶ 65 Judicial estoppel is an extraordinary doctrine that should be applied with caution because it impinges on the fact finder's role by precluding a contradictory position without examining the truth of either statement. *Construction Systems, Inc. v. FagelHaber, LLC*, 2015 IL App (1st) 141700, ¶ 38. The party claiming estoppel must prove that it applies by clear and convincing evidence. *Boelkes v. Harlem Consolidated School District No. 122*, 363 Ill. App. 551, 554 (2006).

¶ 66 Rialmo urges that our review is *de novo*. However, where a trial court has exercised its discretion in applying judicial estoppel, we review for abuse of discretion. *Seymour v. Collins*, 2015 IL 118432, ¶ 48. *De novo* review applies where the exercise of discretion results in the termination of the litigation (*id.* ¶ 49), which did not occur here. See also *Davis v. Pace Suburban Bus Division of the Regional Transportation Authority*, 2021 IL App (1st) 200519, ¶ 31 (if the ruling on judicial estoppel did not terminate the litigation because the court declined to apply it, we review the ruling for an abuse of discretion). An abuse of discretion occurs when the

ruling is arbitrary, fanciful, unreasonable, or when no reasonable person would take the same view. *Favia v. Ford Motor Co.*, 381 Ill. App. 3d 809, 815 (2008).

¶ 67     We address each of the instances where the City purportedly asserted inconsistent facts in the Jones suit and LeGrier trial.

¶ 68                         1. Distances Between LeGrier and Rialmo

¶ 69     Rialmo contends that in the Jones suit, the City stated that when Rialmo fired, LeGrier was two to three feet away, with the bat cocked to swing at him. But at the Board hearing, the City's closing argument asserted a range of distances that were greater than two or three feet.

¶ 70     The City's statement in the Jones suit was from the City's response to a motion for partial summary judgment, where it cited Rialmo's deposition testimony that LeGrier was two or three feet away to support the point that there was sufficient evidence to have a jury decide whether Rialmo was legally justified in using deadly force. The purpose of summary judgment is to determine whether a triable issue of fact exists, not to actually try an issue of fact. *Barrett v. FA Group, LLC*, 2017 IL App (1st) 170168, ¶ 26. Consistent with the purpose of summary judgment, the City's response presented the available evidence to urge that a trial should occur. The City did not assert that the trier of fact should accept that a particular distance as true. Judicial estoppel did not apply.

¶ 71     This is the only instance of an alleged inconsistency from the Jones suit, which ended in a settlement. Because judicial estoppel did not apply to the City's statement from the Jones suit for the reason stated above, we will not address the parties' arguments about whether the City benefitted from the settlement for the purposes of judicial estoppel.

¶ 72    Next, Rialmo asserts that at the LeGrier trial, the City stated that a 10-foot distance between Rialmo and LeGrier did not match up and should be disregarded. Yet, at the Board hearing, the City stated that Rialmo fired from 8 to 10 feet away.

¶ 73    A close examination of the City's statements indicates that they were not totally inconsistent. The statement from the LeGrier trial was from the City's closing, where it critiqued one of the plaintiffs' experts who had stated that Rialmo was at least 10 feet back when he fired. At the Board hearing, the City stated in closing that Rialmo fired 10 to 12 feet away from an innocent bystander, who was Jones. In response to a question from the hearing officer, the City confirmed that the distance between Rialmo and LeGrier was, with "the porch being four feet could be two, three feet and then plus that distance." For a total inconsistency, the City would have had to state that Rialmo fired from 10 feet away, which it did not do at the Board hearing. The City's positions were not totally inconsistent and judicial estoppel did not apply.

¶ 74                          2. Rialmo's Options

¶ 75    Rialmo next asserts that in its closing argument at the LeGrier trial, the City stated that "nobody can really argue that in a period of 5 to 6 or 10 seconds, with Rialmo backing down these stairs and LeGrier running through this door, nobody can really argue that Rialmo wouldn't have been hit with the bat if he didn't fire because that's not reasonable." In contrast, at the Board hearing, the City stated that Rialmo had a number of options available to him instead of firing.

¶ 76    Rialmo misstates the City's position at the Board hearing. The City did not assert that Rialmo firing his gun was not an option. Rather, the City stated in closing that before firing, "Rialmo needed to do something to take Bettie Jones out of the line of fire," and mentioned

various options for doing so. The City did not question the need for lethal force against LeGrier. The two positions are not totally inconsistent and judicial estoppel did not apply.

¶ 77    Rialmo also asserts that at the LeGrier trial, the City stated in its closing that it made no sense that Rialmo had time to get 10 feet away, and there was no time for him to do so. In contrast, at the Board hearing, the City stated in its closing that Rialmo should have continued to back up and get away, and in six seconds, Rialmo was able to get 10 feet away from LeGrier.

¶ 78    Again, the context of both statements is important. In the statement from the LeGrier trial, the City was challenging the idea that LeGrier sprinted and stopped, which, if it occurred, would have given Rialmo time to get 10 feet away and then shoot. The City asserted that narrative did not make sense. The City did not mention that series of events at the Board hearing. The City stated that in six seconds, LeGrier swung and missed and Rialmo finished shooting, at which time the two men were 10 or 11 feet apart. The positions were not totally inconsistent and judicial estoppel did not apply.

¶ 79                                3. Location of Firing

¶ 80    Rialmo next asserts that at the LeGrier trial, the City asserted that Rialmo fired shots from the base of the stairs and not the walkway. But, at the Board hearing, the City stated that Rialmo was on the walkway when he fired his gun.

¶ 81    The City's full statement at the Board hearing was it believed Rialmo testified that he fired from the walkway. According to the transcript, Rialmo testified that he drew his weapon and fired when he reached the bottom of the steps. The Board noted in its order that Rialmo made clear at the LeGrier trial that the bottom of the steps meant the walkway. The two locations appear to be the same and there is no total inconsistency to which judicial estoppel would apply.

¶ 82                           4. Whether Rialmo Acted Recklessly

¶ 83    Rialmo next asserts that in closing at the LeGrier trial, the City stated that it was "reasonable to shoot Quintonio LeGrier under these circumstances." However, at the Board hearing, the City stated in its opening that Rialmo acted recklessly and in reckless disregard.

¶ 84    The City's full statements at the two proceedings indicate there is no total inconsistency to which judicial estoppel would apply. At the LeGrier trial, the City stated, "In the context of these facts, what's reasonable? Was it reasonable for Officer Rialmo to believe that he was about to be seriously injured or killed by Quintonio LeGrier on December 26, 2015? Yes. Was it reasonable to shoot Quintonio LeGrier under these circumstances? Yes." At the Board hearing, the City stated that "the testimony and evidence will show that Officer Rialmo acted recklessly and in reckless disregard for the very thing he swore to protect which was Bettie Jones'[s] life." The City's statement in closing at the LeGrier trial was that Rialmo acted reasonably in light of the threat posed by LeGrier. There was no mention of Jones's impact on the analysis. At the Board hearing, the City's position was that Rialmo acted recklessly because of Jones's presence. Further, the City stated in closing at the Board hearing that Rialmo justifiably shot at LeGrier, that lethal force was not out of the question, and the City would not have challenged the use of deadly force if Jones had not been in Rialmo's line of fire. The City's positions at the two proceedings are reconcilable.

¶ 85    Also, whether conduct was reasonable or reckless is a legal conclusion to which judicial estoppel does not apply. See *Pepper Construction Co.*, 2016 IL App (1st) 142754, ¶ 66 (judicial estoppel does not apply to legal opinions or conclusions). Rialmo states that whether the force used by an officer was reasonable is a question of fact. Still, the answer to a question of fact can be a legal conclusion. See *Daniels v. Corrigan*, 382 Ill. App. 3d 66, 75 (2008) (whether an agency relationship existed is usually a question of fact); *McNamee v. Sandore*, 373 Ill. App. 3d

636, 650 (2007) (assertion that an agency relationship exists is a legal conclusion). That something is a question of fact means that it is disputed and will be resolved by a judge in a bench trial or a jury. Black's Law Dictionary (11th ed. 2019). A legal conclusion is a statement that expresses a legal duty or result, but omits the facts creating or supporting the duty or result. *Id*. The answers to whether Rialmo acted reasonably, recklessly, or in reckless disregard are legal conclusions. Judicial estoppel did not apply to those statements for this additional reason.

¶ 86                                    5. 21-Foot Rule

¶ 87    Rialmo next asserts that at the LeGrier trial, the City stated in closing that the 21-foot rule "illustrates what we've been talking about," and if LeGrier was within 21 feet of Rialmo, he posed a deadly threat. However, the City stated at the Board hearing that the police department does not credit the 21-foot rule.

¶ 88    The two positions were not totally inconsistent. At the Board hearing, the City accepted that LeGrier posed a deadly threat based on his proximity to Rialmo. Further, the City did not fully embrace the rule as police department policy at the LeGrier trial. Judicial estoppel did not apply.

¶ 89                                    6. Deadly Threat

¶ 90    Rialmo next asserts that at the LeGrier trial, the City stated, "You don't need to swing to be a deadly threat, wherever the bat is – it's a deadly threat." In contrast, the City stated at the Board hearing that the mere presence of a bat does not create a situation in which deadly force is justified.

¶ 91    The full context of both statements shows no inconsistency. The City's full statement from the trial was that

"whether or not *** LeGrier swung his bat at Rialmo, whether he swung it and came back up or whether he was just running like this, either way he's a deadly threat. The swing doesn't – you don't need that to be a deadly threat, because up here certainly indicates a swing is coming, and you don't have to wait for it and get hit or almost get hit before you protect yourself.

Whether the bat is up or down, whether the bat is here or here [indicating], whether the bat has been swung or not, at 5 feet, at 8 feet, at 21 feet, the person brandishing it is a deadly threat."

The City's opening at the Board hearing included the statement that "the mere presence of a bat does not create a situation in which deadly force is justified. The proximity of a bat to another person, however, is a key factor in deciding the appropriate level of force." In both proceedings, the City asserted the same position—a bat can be a deadly threat based on the distance from the officer and how the bat is wielded. The two positions were not totally inconsistent and judicial estoppel did not apply.

¶ 92                    7. LeGrier's Location

¶ 93    Rialmo states that at the LeGrier trial, the City asserted in closing that LeGrier came to rest halfway in and halfway out of the building's vestibule. However, the City stated at the Board hearing that LeGrier was all the way in the vestibule when he fell.

¶ 94    At the Board hearing, the City gave two locations where LeGrier fell. The City stated that according to testimony, LeGrier took a step after he was shot, which "allowed him to make it all the way into the vestibule." The City also referred to Rialmo's testimony that LeGrier landed "either entirely" in the vestibule "or on the threshold or with his feet and ankles over the threshold and onto the porch." Based on the dual possibilities given at the Board hearing—one of

which appears to be the same location as was asserted at the LeGrier trial—the City did not put forth totally inconsistent positions. See *Pepper Construction Co.*, 2016 IL App (1st) 142754, ¶ 68 (no showing of total inconsistency where it was unclear what a party's position was at one of the proceedings).

¶ 95                  8. Whether the Officers were Informed

¶ 96    Rialmo next asserts that in its closing argument at the LeGrier trial, the City stated that the information that LaPalermo had before the officers arrived "dispels any notion that they were uninformed." Yet, the City stated in its closing at the Board hearing that the officers "really made no effort to inform themselves about *** what they were going to face at 4710 West Erie before they got there and how they might be best equipped to respond to it."

¶ 97    These positions were totally inconsistent—either the officers were sufficiently informed before arriving at LeGrier's building or not. Still, even if all five elements of judicial estoppel are present, a court must use its discretion to decide whether to apply judicial estoppel. *Seymour v. Collins*, 2015 IL 118432, ¶ 47. Multiple factors may be at work, including the significance or impact of the party's action in the first proceeding and whether there was an intent to deceive or mislead, rather than the prior position having been due to inadvertence or mistake. *Id*. Here, whether the officers were sufficiently informed was a minor point in the LeGrier trial. The City noted that whether the officers were properly informed was not a claim in the case. Also, the Board found Rialmo's failure to reposition himself to be the dispositive issue. The circumstances do not warrant invoking judicial estoppel.

¶ 98                  9. Opinion Testimony

¶ 99    Rialmo contends that judicial estoppel applied to the City's inconsistent use of expert testimony. Rialmo states that at the LeGrier trial, the City presented Kapelsohn's testimony that

Rialmo could not see Jones and could not know that she was in the line of fire. At the Board hearing, the City presented Gennaco's testimony, which contradicted Kapelsohn's, and repeatedly argued that Rialmo knew that Jones was in the line of fire.

¶ 100    Kapelsohn's and Gennaco's opinions about whether Rialmo saw Jones are not inconsistent. Rialmo misstates Kapelsohn's trial testimony. At the LeGrier trial, Kapelsohn opined why Rialmo did not see Jones: LeGrier blocked Rialmo's view of her, an outer door partly obscured anything inside the vestibule, and the concept of tunnel vision was at work. Kapelsohn did not dispute that Rialmo knew that bystanders were nearby. At the Board hearing, Gennaco's testimony accepted that Rialmo did not see Jones, but explained why he should have known Jones was near LeGrier anyway. These opinions are entirely reconcilable. That ends the inquiry of whether judicial estoppel applies to those aspects of Kapelsohn's and Gennaco's opinions.

¶ 101    Rialmo also argues that two other uses of expert opinions met the elements for judicial estoppel. Rialmo states that at the LeGrier trial, the City presented Dr. McElligott's testimony to assert that LeGrier's arm was raised, but at the Board hearing, the City offered into evidence the testimony of Dr. Melinek that LeGrier's arm was down. Rialmo also notes that at the LeGrier trial, the City presented Kapelsohn's testimony that Rialmo acted reasonably, and Kapelsohn analyzed the impact of Jones's presence. At the Board hearing, the City presented Gennaco, who refuted the City's position at the LeGrier trial, mirrored the plaintiffs' position at the LeGrier trial, and directly contradicted Kapelsohn's testimony in both proceedings. Rialmo contends that after its victory in the LeGrier trial, the City abruptly changed its position about whether Rialmo acted reasonably and justifiably.

¶ 102    Whether judicial estoppel applies to an expert's opinion depends on the function of that opinion. This court has stated that judicial estoppel does not apply to opinions that involve "numerous intangible factors which could be weighed and combined in a wide variety of ways." *Ceres Terminals, Inc.*, 259 Ill. App. 3d at 852. Judicial estoppel does apply to opinions that provide an essential element of the cause of action. *Smeilis v. Lipkis*, 2012 IL App (1st) 103385, ¶ 32. In *Smeilis*, the plaintiffs filed a medical negligence claim against a defendant hospital, nursing home, and doctor, and settled with all of the defendants except the doctor. *Id.* ¶ 12. Within a month, the plaintiffs filed a new complaint against the doctor, this time with a new expert that contradicted the opinion of the expert from the first claim. *Id.* ¶ 14. In finding that judicial estoppel applied, the court noted that a medical malpractice suit requires expert testimony on the standard of care. *Id.* ¶ 31. The second expert's testimony "provided an essential element of the plaintiffs' cause of action," which distinguished the case from the opinion testimony in *Ceres Terminals*. *Id.* ¶ 32. The plaintiffs "adopted a wholly new view of the facts" to recover against the doctor. *Id.* ¶ 33.

¶ 103    The City's use of the doctors' testimony at the two proceedings is troubling, but ultimately does not rise to the level of the plaintiffs' conduct in *Smeilis*. At the LeGrier trial, the City offered Dr. McElligott's testimony that a wound to LeGrier's arm was consistent with his arm raised to swing a bat. The LeGrier plaintiffs offered the testimony of Dr. Melinek, who stated that LeGrier's arm was down when he was shot and his wounds were inconsistent with testimony that LeGrier was holding a bat over his shoulder at the time of the shooting. At the Board hearing, the City offered Dr. Melinek's testimony. The City thus presented inconsistent expert testimony about the position of LeGrier's arm.

¶ 104   We acknowledge that here, the Board credited Dr. Melinek's testimony, and further found that at the time of the shooting, LeGrier was neither charging nor actively swinging the bat at Rialmo. However, the City's position at the Board hearing did not rely on whether LeGrier's arm was raised or down. See *Batson*, 2013 IL App (1st) 123071, ¶ 30 (expert opinion in *Smeilis* was necessary for the plaintiff to succeed on her medical negligence claim). The City focused on Rialmo's ability to reposition himself and his proximity to Jones. A further consideration is that, as noted above, even where all elements for judicial estoppel are met, a court may still decline to apply it based on the significance or impact of the party's action in the first proceeding. *Seymour*, 2015 IL 118432, ¶ 47. At the LeGrier trial, the position of LeGrier's arm was a minor point in the City's defense. Much more emphasized was Kapelsohn's testimony that LeGrier did not need to swing the bat to be a deadly threat. Under these circumstances, we decline to find that judicial estoppel applied to Dr. Melinek's opinion.

¶ 105   The City's use of Kapelsohn's and Gennaco's testimonies also does not call for invoking judicial estoppel. Kapelsohn's opinion that it was not reckless for Rialmo to fire, knowing there were bystanders, was not an essential element of the plaintiffs' case or the defense in the LeGrier trial. The outcome of the LeGrier trial did not depend on Jones's presence. Neither the jury instructions not the special interrogatory mentioned bystanders generally or Jones in particular. As noted above, the City stated at the Board hearing that lethal force was necessary against LeGrier, consistent with its position at the LeGrier trial. The City asserted that point in closing and Gennaco opined that he would have approved of using deadly force against LeGrier if LeGrier continued to be aggressive and Jones was no longer in Rialmo's field of fire.

¶ 106   Also, Rialmo's disciplinary process indicates that the City did not deliberately change its position to suit the exigencies of the moment. The police superintendent initially disagreed with

COPA's recommendation to discipline Rialmo. Following the process in section 2-78-130 of the Chicago Municipal Code (added Oct. 5, 2016), a reviewing member of the Board found that a hearing was necessary, and the disciplinary recommendation was deemed accepted by the superintendent. At the Board hearing, the City prosecuted the charges against Rialmo consistent with its obligations under the Municipal Code. Further, the process began months before the LeGrier trial and the charges were apparently amended to conform with the jury verdict, which found that Rialmo reasonably believed that deadly force was necessary against LeGrier, but said nothing about Jones. The purpose of judicial estoppel is to protect the court from unscrupulous litigants and preserve the integrity of the court system. *Construction Systems, Inc.*, 2015 IL App (1st) 141700, ¶ 38. There is no evidence that the City intended to deceive or mislead the court. Judicial estoppel did not apply.

¶ 107                                  B. Collateral Estoppel

¶ 108   Next, Rialmo contends that collateral estoppel should have prevented the City from relitigating the issues decided in the LeGrier trial, including that Rialmo justifiably fired his weapon. Rialmo states that Jones was an important part of the trial evidence and her presence was a thoroughly developed issue related to Rialmo's use of force. Rialmo asserts that the jury found that his use of force was justified, even considering the risk it posed to Jones. Rialmo states that at the Board hearing, the City relitigated Rialmo's actions towards LeGrier and the Board found that LeGrier did not pose a threat to Rialmo.

¶ 109   Collateral estoppel is an equitable doctrine that promotes fairness and judicial economy by preventing the relitigation of issues that were resolved in earlier actions. *Du Page Forklift Service, Inc. v. Material Handling Services, Inc.*, 195 Ill. 2d 71, 77 (2001). Collateral estoppel applies if the following elements are met:

> "(1) the issue decided in the prior adjudication is identical with the one presented in the current action, (2) there was a final judgment on the merits in the prior adjudication, (3) the party against whom estoppel is asserted was a party to, or in privity with a party to, the prior adjudication, and (4) the factual issue against which the doctrine is interposed was actually and necessarily litigated and determined in the prior adjudication."
>
> *Amalgamated Transit Union, Local 241 v. Chicago Transit Authority*, 2014 IL App (1st) 122526, ¶ 12.

The party claiming collateral estoppel must prove the doctrine applies by clear, concise, and unequivocal evidence (*Pedersen v. Village of Hoffman Estates*, 2014 IL App (1st) 123402, ¶ 42), and bears the burden of showing with clarity and certainty what was determined by the prior judgment (*Sarno v. Akkeron*, 292 Ill. App. 3d 80, 85 (1997)). We review *de novo* whether collateral estoppel applies in a particular case. *Pedersen*, 2014 IL App (1st) 123402, ¶ 42.

¶ 110   Though Jones was mentioned at the LeGrier trial, it is not clear that the jury considered her presence when it found that Rialmo acted reasonably. To review, the jury found that when Rialmo used deadly force against LeGrier, Rialmo reasonably believed that such force was necessary to prevent imminent death or great bodily harm to himself or LaPalermo. Rialmo claims that one of the plaintiffs' experts, Charles Drago, was presented to assert that Jones's proximity made the use of force unjustified. Drago's testimony is not in the record, and as the appellant, Rialmo had the burden to present a sufficiently complete record of the proceedings to support his claims on appeal. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Nonetheless, the special interrogatory is narrowly worded and only names three people: Rialmo, LaPalermo, and LeGrier. The jury instructions do not mention taking Jones's presence into consideration. In contrast, the Board charges explicitly focused on Rialmo's act of shooting in

Jones's direction. Collateral estoppel does not apply "if it is not clear that the former judgment or verdict necessarily decided the factual issue at issue in the subsequent proceeding." *In re Estate of Ivy*, 2019 IL App (1st) 181691, ¶ 39. Without certainty that the jury decided that Rialmo acted reasonably considering Jones's presence, collateral estoppel did not bar the charges before the Board.

¶ 111                              C. Manifest Weight of the Evidence

¶ 112   Next, Rialmo contends that the Board's findings and conclusions were against the manifest weight of the evidence. Rialmo states that the Board's decision was based on Rialmo's and LeGrier's positions, and not Jones's position, and the Board ignored an admonition not to apply hindsight to assess an officer's conduct. Also, the Board incorrectly found that Rialmo was 8 to 10 feet away from LeGrier when he fired his weapon, LeGrier was not a threat to Rialmo, and Rialmo knew or should have known Jones's location.

¶ 113   We apply a two-step analysis to review the Board's decision. *McDermott v. City of Chicago Police Board*, 2016 IL App (1st) 151979, ¶ 18. We first determine whether the Board's factual findings are against the manifest weight of the evidence. *Id.* Then, we determine whether the factual findings provide a sufficient basis for the Board's determination that there was cause for discharge. *Id.*

¶ 114   The Board's findings and conclusions on questions of fact are deemed *prima facie* true and correct. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). This court does not reweigh evidence or make an independent determination of the facts. *Scepurek v. Board of Trustees of Northbrook Firefighters' Pension Fund*, 2014 IL App (1st) 131066, ¶ 17. A finding of fact is against the manifest weight of the evidence when the opposite conclusion is clearly evident. *City of Belvidere*, 181 Ill. 2d at 205. The mere fact that an opposite

conclusion is reasonable or that this court might have ruled differently are not reasons to reverse the Board's findings. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). The Board's decision should be affirmed if the record contains evidence to support it. *Id*. We will address each of the findings that Rialmo challenges.

¶ 115                    1. The Decision Was Not Based on Jones's Position

¶ 116   Rialmo asserts that the Board's decision relied on Rialmo's and LeGrier's positions, and not Jones's position. Rialmo states that the finding that his conduct was unreasonable was based on LeGrier not charging or swinging at him, having his back to Rialmo, and being 8 to 10 feet away.

¶ 117   Rialmo's argument appears to be another attempt to show that the Board hearing is precluded or inconsistent with the verdict from the LeGrier trial. We have already found that judicial and collateral estoppel did not apply. Still, the Board distinguished its decision from the jury verdict. The Board explained that using deadly force may be reasonable to stop a man wielding a bat at an officer, but what is reasonable must be adjusted based on the totality of the facts of the case. Due to Jones's proximity, Rialmo had the obligation to try to reposition himself, as well as the ability to do so. The Board did not depart from its mission to assess Rialmo's conduct in light of Jones's presence.

¶ 118                        2. Use of 20/20 Hindsight

¶ 119   Rialmo next contends that the Board misapplied the standard from *Graham v. Connor*, 490 U.S. 386 (1989), for assessing an officer's conduct. In *Graham*, 490 U.S. at 396, the Supreme Court stated, "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Rialmo argues that the Board usurped the perspective of a reasonable officer with its own

arbitrary hindsight, finding that Rialmo acted unreasonably because there was one speculative alternative option available to him.

¶ 120   The Board's decision did not run afoul of *Graham*. Central to the Board's conclusion was that Rialmo had the obligation and ability to reposition himself so that Jones was not harmed. In part, the Board credited evidence in the record that LeGrier was not actively swinging his bat and Rialmo was on the walkway with a clear path to reposition. The Board noted that LaPalermo had repositioned. Gennaco, a police practices expert, testified that a reasonable officer would have taken more time to draw out LeGrier from the entranceway. The Board did not speculate or improperly apply 20/20 hindsight. Its decision was based on the evidence.

¶ 121                    3. Distance Between Rialmo and LeGrier

¶ 122   Rialmo next contends that in finding that Rialmo was 8 to 10 feet from LeGrier when he fired his weapon, the Board credited Rialmo over other witnesses who testified that Rialmo and LeGrier were closer together.

¶ 123    As Rialmo notes, he testified at the Board hearing that at the end of the incident, he was roughly 8 to 10 feet away from LeGrier. The Board's finding is supported by the evidence because the end of the incident encompasses the time when Rialmo was shooting. Further, there was no single, definitive distance given for where exactly Rialmo and LeGrier were at the beginning and end of the incident, with various ranges offered at the LeGrier trial and Board hearing. We will not reweigh the evidence and independently determine the distance between Rialmo and LeGrier. See *Scepurek*, 2014 IL App (1st) 131066, ¶ 17 (not a court's function to reweigh evidence or make an independent determination of the facts). The Board's finding has a basis in the record and was not against the manifest weight of the evidence.

¶ 124                    4. Whether LeGrier Was a Threat to Rialmo

¶ 125   Rialmo next asserts that the Board incorrectly found that LeGrier was not a threat to Rialmo and portrayed the shooting as a litany of shots to LeGrier's back. Rialmo states that the Board should have credited different portions of Dr. Alvarenga's and Dr. Melinek's testimonies, and the Board improperly disregarded testimony from Dr. McElligott.

¶ 126   There were conflicts among the three medical experts about LeGrier's exact position when he was shot, but those conflicts were for the Board to resolve. See *Orsa v. Police Board of the City of Chicago*, 2016 IL App (1st) 121709, ¶ 47 (conflicts in witness testimony are not a sufficient reason to reverse an agency's decision because it is the agency's responsibility to resolve conflicting evidence). Again, it is not our function to reweigh the evidence or make an independent determination of the facts. *Scepurek*, 2014 IL App (1st) 131066, ¶ 17. The Board was entitled to credit the testimonies of Dr. Alvarenga and Dr. Melinek in the ways that it did over that of Dr. McElligott. The Board acknowledged that LeGrier was a threat to Rialmo. However, based on the evidence of LeGrier's and Jones's positions, Rialmo could and should have moved so that Jones was not in his line of fire.

¶ 127                         5. Knowledge of Jones's Location

¶ 128   Rialmo next asserts that the Board erroneously found that Rialmo knew or should have known Jones's location. According to Rialmo, the Board illogically stated that Rialmo had enough time to move from the vestibule to the walkway some 10 feet away, but Jones had no time to move at all.

¶ 129   The Board's actual findings—that Rialmo knew or reasonably should have known Jones was in his line of fire, and Rialmo knew or had reason to know of her presence—were supported by the evidence. Rialmo testified that when LeGrier burst through the door, Jones was still in the vestibule. The last time Rialmo saw Jones, she was standing in the vestibule. Gennaco noted that

Rialmo had interacted with Jones. The Board's findings were not against the manifest weight of the evidence.

¶ 130                                    D. Termination for Cause

¶ 131    Rialmo next contends that the Board did not have cause to discharge him. Rialmo states that even if the findings are correct, they do not show a substantial shortcoming that warranted discharge.

¶ 132    A police officer may not be discharged without cause. 65 ILCS 5/10-1-18 (West 2014). "Cause" is a substantial shortcoming that renders the officer's "continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for his discharge." (Internal quotation marks omitted.) *Orsa*, 2016 IL App (1st) 121709, ¶ 60 (quoting *Walsh v. Board of Fire & Police Commissioners*, 96 Ill. 2d 101, 105 (1983)). The Board has considerable latitude and discretion to determine what constitutes cause for discharge. *McDermott*, 2016 IL App (1st) 151979, ¶ 34. Because the Board, and not the reviewing court, stands in the best position to determine the effect of an officer's conduct on the department, we heavily defer to the Board's determination of cause. *Orsa*, 2016 IL App (1st) 121709, ¶ 60. The Board's decision will not be overturned unless it is arbitrary and unreasonable, or unrelated to the requirements of the service. *Id.* ¶ 48.

¶ 133    The Board found that Rialmo's use of deadly force was unreasonable under the totality of the circumstances. The Board considered mitigating evidence that had been presented, but concluded that Rialmo's misconduct was incompatible with his continued service as a police officer. That conclusion was not arbitrary, unreasonable, or unrelated to the requirements of service. The Board noted that the police department and Chicago residents "rightfully demand

that police officers protect those around them." Rialmo did not take precautions that were available to him, which resulted in the death of an innocent civilian. The Board had cause to discharge Rialmo.

¶ 134                                    D. Due Process

¶ 135    Rialmo next contends that the Board's procedures violated his due process rights in the following ways: (1) the City's delay in bringing disciplinary charges was a deliberate and intentional strategy to use the Board to unfairly discharge him, (2) prior review by a Board member tainted the subsequent determination by the remaining members, (3) COPA concealed an expert report written by Robert Harrington, (4) a Board member did not timely recuse himself, (5) the hearing officer did not provide Rialmo with a written report, and (6) before and during the proceedings, the Board held regular public meetings where it received opinions, urges, pleas, and protests as to Rialmo's discipline.

¶ 136    Administrative proceedings are governed by fundamental principles and requirements of due process of law. *Comito v. Police Board of the City of Chicago*, 317 Ill. App. 3d 677, 686 (2000). A reviewing court examines the procedures used at the hearing to ensure they were fair and impartial. *M.F. Booker v. Board of Education of the City of Chicago*, 2016 IL App (1st) 151151, ¶ 57. "A court will find a due process violation only if there is a showing of prejudice." *Engle v. Department of Financial & Professional Regulation*, 2018 IL App (1st) 162602, ¶ 43. Whether a party's due process rights were violated during an administrative hearing is a question of law that we review *de novo*. *M.F. Booker*, 2016 IL App (1st) 151151, ¶ 56. With those principles in mind, we turn to Rialmo's alleged violations.

¶ 137                          1. Delay in Bringing Charges

¶ 138   Recalling the history of the civil suits, Rialmo notes that the City obtained a favorable jury verdict in the LeGrier trial in June 2018, and the City Council approved the Jones settlement in September 2018. Just weeks later, on November 7, 2018, the City recommended Rialmo's discharge. Rialmo argues that the City had nearly three years to file charges against him, but first required him to help the City in the civil suits. When Rialmo was no longer useful, the City betrayed him and wholly reversed its position as to his conduct.

¶ 139   Rialmo raised this issue after the hearing was over, in a motion to reconsider that the Board found it did not have jurisdiction to address. A party forfeits administrative review of issues and defenses not placed before the administrative agency. *Keeling v. Board of Trustees of the Forest Park Police Pension Fund*, 2017 IL App (1st) 170804, ¶ 45. Also, Rialmo cites no authority to support his assertion that the timing of his disciplinary proceedings violated his due process rights. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010) (both argument and citation to relevant authority are required). Those problems aside, Rialmo misstates the timing of the disciplinary charges. The disciplinary process actually began before the LeGrier trial, in December 2017, when COPA first recommended discipline. The charges initially included that Rialmo shot LeGrier without justification. The charges were later amended to focus on Rialmo's actions as to Jones, suggesting that the City acted consistently with the jury verdict. The timeline of events does not suggest that the City used Rialmo for its own purposes and then betrayed him.

¶ 140                    2. Prior Review by a Reviewing Member

¶ 141   Rialmo next challenges the procedure in which a reviewing Board member determined whether the issue of his discharge should progress further. Rialmo notes that the reviewing member determined that the issue of Rialmo's discharge should progress to the Board. Rialmo

acknowledges that the reviewing member recused herself from the case, but argues that because the reviewing member made such a significant preliminary determination, any subsequent determination by the remaining Board members was tainted. Rialmo further argues that the procedure compelled the superintendent to take a position that contradicted his recommendation. Rialmo states that whether the procedure actually influenced the remaining Board members or created an appearance of influence, his due process rights were violated.

¶ 142   We review the procedure that is the subject of Rialmo's argument. Under section 2-78-130(a)(iii) of the Chicago Municipal Code (added Oct. 5, 2016), if the Chief Administrator of COPA and the police superintendent disagree about a disciplinary recommendation, a member of the Board reviews the matter. If the reviewing member determines that the superintendent did not meet his burden of overcoming the disciplinary recommendation, the recommendation is deemed accepted by the superintendent and a hearing ensues. *Id*. The reviewing member recuses herself from any future involvement with the case by the full Board. *Id.* Consistent with this procedure, reviewing member Delgado recused herself after she found that an evidentiary hearing was necessary. Rialmo asserts that Delgado's recusal tainted the rest of the proceedings.

¶ 143   We presume that administrative officials, including Board members, are objective and capable of fairly judging an issue. *Kimball Dawson, LLC v. City of Chicago Department of Zoning*, 369 Ill. App. 3d 780, 791-92 (2006). Rialmo has presented no evidence from the record that the Board members who weighed the evidence from the hearing were biased or partial in any way. Rialmo also has not cited any authority to support his argument that the procedure set out in the Chicago Municipal Code violates an officer's due process rights as a general matter. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *McCann v. Dart*, 2015 IL App (1st) 141291, ¶ 15 (Rule

341(h)(7) requires the appellant to present reasoned argument and cite to legal authority and specific portions of the record to support his claim of error). Rialmo's argument is unavailing.

¶ 144                                    3. Harrington Report

¶ 145   Rialmo asserts that COPA concealed Harrington's exculpatory opinion and did not disclose its existence or content to the superintendent or the reviewing member. Rialmo argues that if the report had been disclosed, the matter would not have proceeded to a hearing. Rialmo also states that the problem was not cured by his eventual learning of the report because the report was concealed from the person tasked with deciding whether the charges should proceed.

¶ 146   The Harrington report—which is referred to in the record as an email—is not in the record. The email apparently described a consensus that was reached at a meeting about the incident. The hearing officer called the email "potentially exculpatory" and Kapelsohn noted at the hearing that the email stated that Harrington and others felt the use of force was justified. Still, without the actual email or any details about how the email was supposedly concealed, we cannot say that disclosing the email earlier would have changed the course of the proceedings. Rialmo had the burden to present a sufficiently complete record to support his claim of error, and any doubts that arise from the incompleteness of the record are resolved against Rialmo. See *Foutch*, 99 Ill. 2d at 391-92. Thus, we presume that the email would not have affected the proceedings and that Rialmo was not prejudiced.

¶ 147                                    4. Board Member's Recusal

¶ 148   Rialmo notes that after the denial of his motion to dismiss, Board member O'Malley recused himself due to a conflict of interest. According to Rialmo, however, the conflict for which O'Malley recused himself existed at the time he denied the motion to dismiss. Rialmo

contends that allowing O'Malley to influence and make such a crucial determination violated Rialmo's due process rights.

¶ 149   Rialmo must "overcome the presumption of honesty and integrity of those serving as adjudicator for an agency and provide sufficient proof that the risk of unfairness is 'intolerably high.' " *Emergency Treatment, S.C. v. Department of Employment Security*, 394 Ill. App. 3d 893, 907 (2009) (quoting *Bethlehem Steel Corp. v. United States Environmental Protection Agency*, 638 F.2d 994, 1009 (7th Cir. 1980)). Yet, Rialmo does not explain the nature of O'Malley's conflict of interest, provide evidence that the conflict indeed existed when the motion to dismiss was denied, or cite authority to support his argument. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must be supported by citation to authority and pages of the record relied on). Rialmo's bare assertion will not overcome the presumption of honesty and integrity. He has not shown a due process violation.

¶ 150                               5. Written Report

¶ 151   Rialmo next contends that the hearing officer did not provide him with a written report that was required by a consent decree issued by the United States District Court for the Northern District of Illinois. Rialmo acknowledges the general rule that third-party beneficiaries do not have standing to enforce consent decrees against the government, but invokes the principle that a third party has standing to enforce a contract where the contract clearly intends to confer a benefit on that party.

¶ 152   The State of Illinois and the City of Chicago entered into a consent decree dated January 31, 2019, to ensure that the City and police department "deliver services in a manner that fully complies with the Constitution and laws of the United States and the State of Illinois, respects the rights of the people of Chicago, builds trust between officers and the communities they serve,

and promotes community and officer safety," among other aims. *Illinois v. City of Chicago*, No. 1:17-cv-06260 (N.D. Ill.), Dkt. 703-1, ¶ 2. In part, the consent decree provides that before any vote by the Board in a disciplinary action, the City will ensure that the hearing officer prepares a written report. *Id*. ¶ 535(c). The parties to the Board hearing have 14 days to review the hearing officer's report and recommendation and file any written objections. *Id*. ¶ 535(e).

¶ 153   Rialmo cannot seek a remedy under the consent decree. As a general matter, only an intended—as opposed to incidental—third-party beneficiary has rights and may sue under an agreement to which he is not a party. *Carlson v. Rehabilitation Institute of Chicago*, 2016 IL App (1st) 143853, ¶ 14. Government consent decrees are a special category of contract. Only the government can seek enforcement of its consent decrees, so even if the government intended a consent decree to benefit a third party, that party could not enforce it unless the decree provided for that. *Bergman v. Water Reclamation District of Greater Chicago*, 274 Ill. App. 3d 686, 688 (1995). Here, the consent decree makes clear that third parties may not enforce it, stating, "No person or entity is or is intended to be a third-party beneficiary of this Agreement for the purposes of any civil, criminal, or administrative action." *Illinois v. City of Chicago*, No. 1:17-cv-06260 (N.D. Ill.), Dkt. 703-1, ¶ 707. Rialmo cannot enforce the consent decree.

¶ 154   Consent decree aside, this court has found that a party's failure to receive a written report from an administrative hearing is not a due process violation. *Starnawski v. License Appeal Comm'n of the City of Chicago*, 101 Ill. App. 3d 1050 (1981). A hearing officer must convey his findings, conclusions, and impressions of conflicting testimony, by oral or written report, to the decision-making body. *Id.* at 1054. But due process does not require that the report be made available to the parties, even though disclosing the report may be desirable. *Id.* at 1055.

Rialmo has not shown that his due process rights were violated by failing to receive a written report.

¶ 155                               6. Comments at Public Meetings

¶ 156   Lastly, Rialmo contends that the Board was improperly influenced by public comments about the subject incident. Rialmo states that minutes and transcripts from numerous Board meetings show that the Board repeatedly received the impassioned arguments and protests of citizens urging the Board to discharge Rialmo. He asserts that allowing the parties responsible for hearing evidence and deciding his fate to entertain public influence violates his due process rights. Rialmo states that the Board created the platform for community input to engage the community, so the City and Board cannot claim that such public input had no influence on the proceedings.

¶ 157   As the City notes, Rialmo's brief does not cite to where the offending comments can be found. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain citations to authority and the pages of the record relied on). There are no transcripts of public meetings in the record. Rialmo's complaint for administrative review listed websites where transcripts for public meetings could be found, as well as examples of the comments Rialmo found problematic. It is not clear whether those are the same comments that are the subject of Rialmo's appeal.

¶ 158   Still, taking as true Rialmo's assertion that the comments strongly urged the Board to discharge Rialmo, he has not shown that his due process rights were violated. Rialmo contends that the comments biased the Board members. Again, we presume that administrative officials are objective and capable of fairly judging an issue. *Kimball Dawson, LLC*, 369 Ill. App. 3d at 791-92. Bias may be shown "only if a disinterested observer would conclude that the agency, or its members, had adjudged the facts and law of the case before the matter was heard." *Id*. at 792.

Here, there is no evidence of bias. To the contrary, the hearing transcript indicates that the hearing officer was impartial and had not prejudged the outcome. The Board's written decision addressed the evidence from both parties and its findings and conclusions were supported by the record.

¶ 159   *Ciechon v. City of Chicago*, 686 F.2d 511 (7th Cir. 1982), a case relied on by Rialmo, is a far cry from the proceedings here. In *Ciechon*, 686 F.2d at 517, the City's reaction to the threat of adverse publicity from an incident "infused the disciplinary procedures with a deliberate, illegitimate bias." The city made no effort to assess the incident fairly and limited its investigation to justify discharging the plaintiff. *Id*. at 520. There were a litany of irregular administrative procedures, all of which "[added] up to a case slanted from the start against [the] plaintiff, heard by a kangaroo court." *Id.* at 521-22. The record did not support the city's position that the incident rationally supported the plaintiff's discharge. *Id.* at 518. Here, there is no evidence of irregularities in the way the investigation was conducted or how the charges were brought. As stated above, the transcript reveals no bias at the hearing itself and the Board's decision indicates that it thoroughly considered all of the evidence. Rialmo has not shown that his due process rights were violated by public comments about the incident.

¶ 160                             III. CONCLUSION

¶ 161   For the foregoing reasons, we affirm the decision of the Board.

¶ 162   Affirmed.